**Ronald PERKINS, Appellant;**

v.

**UNITED STATES, Appellee.**

**Garnell HAMILTON, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 80–132, 80–161.**

District of Columbia Court of Appeals.

Argued Dec. 4, 1980.

Decided May 24, 1982.

Silas Wasserstrom, Public Defender Service, Washington, D. C., with whom Richard S. Greenlee, Public Defender Service, Washington, D. C., was on brief, for appellant Perkins.

Mark N. Duvall, Washington, D. C., appointed by this court, with whom Charles F. Lettow, Washington, D. C., was on brief, for appellant Hamilton.

Harold Damelin, Asst. U. S. Atty., with whom Charles F. C. Ruff, U. S. Atty. at the time briefs were filed, and John A. Terry, Michael W. Farrell and Harold L. Cushenberry, Jr., Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before NEBEKER, MACK and FERREN, Associate Judges.

PER CURIAM:

Appellants were convicted in a joint trial by jury of malicious disfigurement while armed and assault with a dangerous weapon. D.C.Code 1973, §§ 22–506, –3202, and –502, respectively. They had been indicted for assault with intent to kill while armed, id., §§ 22–501, –3202, assault with intent to commit robbery while armed, id., §§ 22–501, –3202, mayhem and malicious disfigurement while armed, id., §§ 22–506, –3202, sodomy, id., § 22–3502, and arson, id., § 22–401. Before the start of trial the government dismissed the arson count, and at the conclusion of the government's case the court dismissed the sodomy count. Together, appellants assert several grounds for reversal. Both maintain that the trial judge committed reversible error in instructing the jury on the common law elements of malicious disfigurement. In that regard, appellants contend that the trial judge erred in refusing to instruct the jury that specific intent is an element of the crime and erred in his definition of the element of permanent disfigurement. Partly as a corollary to this attack on the convictions, appellants maintain that since the elements of the crime were improperly stated more broadly than the common law precedents require, the convictions are unsupported by sufficient evidence. The feudal origins of this common law crime and the sparsity of precedential case law have led both counsel and the court deep into English and Colonial history with the result that the majority of our opinion deals with this issue. We find we agree with appellants and thus conclude that the trial judge erred in declining to include a specific intent element in his instruction covering malicious disfigurement.

Appellants also maintain that the trial judge should have vacated their convictions for assault with a deadly weapon on their post-verdict motion because that charge is arguably a lesser included offense of malicious disfigurement while armed and merged with that conviction. Hamilton proposes that his conviction be reversed for the additional reason that the trial judge failed sua sponte to sever his trial from that of Perkins. These contentions have no merit.

We affirm the convictions for assault with a deadly weapon but reverse the convictions for malicious disfigurement while armed.

I

Responding to a fire in an apartment building, a D.C. firefighter discovered Larry Quarles lying in the basement, his scalp convulsed in two or three places and his eye apparently displaced from its socket. The basement was littered with various items, including cement blocks and an iron pipe which were bloodied.

Perkins was arrested by police who were directed to his home by a witness who had seen him fleeing the building. When arrested, Perkins had blood on his pants and shoes. This blood later was matched to the blood type of the victim. Police investigation eventually led to the arrest of Hamilton.

Four other men were in the basement of the building at the time of the offenses "having a little bull session and drinking." From their testimony, the following sequence of events emerges. Perkins and Hamilton dragged Quarles down the stairs into the basement where the four other men were talking, at which time Quarles already appeared beaten and bloodied. Both appellants demanded money from Quarles. While doing so, they beat him repeatedly with a cinder block, a stick, an iron pipe, and an angle iron from a steel door frame. One of the men gathered in the basement testified that one of the appellants stabbed Quarles several times dur-

ing the attack. Another testified that Hamilton at one point threw a dresser on Quarles. Testimony from all four men indicated that Perkins may have attempted an act of sodomy on Quarles.[1]

During the ordeal, the single light bulb illuminating the basement was broken and a fire was started to provide light. As smoke spread, an occupant of the building called the fire department. When the engines arrived, the group fled the basement leaving Quarles behind. The entire attack lasted approximately one and a half hours.

The attending physician during Quarles' twenty-two-day hospitalization testified as to the injuries Quarles suffered. He received a convulsion of the scalp, meaning that a portion of the scalp had actually been torn away. His face and eye were lacerated and he received puncture wounds of the arms and torso. Quarles also sustained residual brain damage.

A plastic surgeon treated Quarles for severe lacerations to his left eye which had become depressed. X-rays revealed an orbital floor fracture of the eye which required surgery. The injury and the surgical repair both left scars in this area.

At the conclusion of the government's case, appellants announced that they would present no evidence and there followed a discussion of jury instructions. Both appellants requested the court to instruct the jury that assault with a dangerous weapon was a lesser included offense of two of the indicted offenses, namely assault with intent to kill while armed, D.C.Code 1973, §§ 22–501, –3202, and assault with intent to commit robbery while armed, D.C.Code 1973, §§ 22–501, –3202. The court agreed to give this instruction. Neither appellant, however, requested that the court instruct the jury that assault with a dangerous weapon was a lesser included offense of malicious disfigurement while armed, an argument which they now advance on appeal. As for the malicious disfigurement while armed instruction, both the government and appellant Perkins submitted proposed jury instructions to the court. After con-

sidering these submissions the court drafted its own instruction. Appellant Perkins objected to it; appellant Hamilton did not.

The court instructed the jury, in part, as follows:

The essential elements of the charge of Malicious Disfigurement, each of which the Government must prove beyond a reasonable doubt, are one, that the defendant inflicted an injury on the complaining witness Mr. Larry Quarles.

Two, that as a result of the injury the complaining witness was permanently disfigured.

Three, that the defendant inflicted the injury on the complaining witness with malice and four, that the defendant inflicted the injury while armed with or having readily available a dangerous or deadly weapon.

\* \* \* \* \* \*

Malice means a state of mind or heart regardless of the life or safety of another. It may also be defined as a condition of mind which prompts a person to do wilfully, that is on purpose without adequate provocation, justification or excuse, a wrongful act the foreseeable consequence of which is a serious permanent disfiguring bodily injury to another.

In contrast, appellant Perkins had requested, in part, the following instruction:

Malicious disfigurement is the intentional infliction of permanently disfiguring injury on another person by total or partial removal of a cosmetically important organ or bodily part, or by severe scarring of the skin.

The elements of the offense, each of which the Government must prove beyond a reasonable doubt, are:

1. That the defendant inflicted an injury on the complainant;

\* \* \* \* \* \*

4. That at the time the defendant inflicted the injury, he specifically intended to cause the disfigurement, that is, that the defendant had in his mind a specific

---

1. At the conclusion of the government's case, the court dismissed the sodomy charges.

desire or purpose to disfigure the complainant.

## II

Both mayhem and malicious disfigurement are contained in a single statute, D.C. Code 1973, § 22–506, which was enacted in 1901 and has never been amended. The statute provides:

Every person convicted of mayhem or of maliciously disfiguring another shall be imprisoned for not more than ten years.

We conclude that the crime of malicious disfigurement requires proof of specific intent and, consequently, that the trial court's instruction, in omitting this element of the offense, was erroneous.

A. Both parties agree that neither the statute itself nor the District of Columbia Criminal Jury Instructions (3d ed. 1978) provides a definition of malicious disfigurement. In the absence of a statutory definition of the elements of a crime, the common law definition is controlling. *Clark v. United States,* D.C.App., 418 A.2d 1059, 1061 (1980); *United States v. Bradford,* U.S. App., 344 A.2d 208, 213 (1975).[2]

We turn, then, to the common law of the District of Columbia as defined by D.C.Code 1973, § 49–301.[3] Our common law consists of the common law of Maryland and all British statutes in force in Maryland in 1801, unless inconsistent with provisions of the District of Columbia Code. *Id.* In 1776, Maryland adopted the common law as it then existed in England. *O'Connor v. United States,* D.C.App., 399 A.2d 21, 25 (1979); *Gladden v. State,* 273 Md. 383, 389, 330 A.2d 176, 180 (1974); Md.Const. Decl. Of Rts., art. 5. At that time malicious disfigurement was a part of English statutory law, having been enacted as a crime in

1670 when Parliament found it necessary to close a loophole in the common law crime of mayhem. This loophole in the crime of mayhem had permitted some imaginative rogues to escape punishment for some calculatedly heinous acts.

The loophole derived from the fact that, at common law, mayhem consisted of "violently depriving another of the use of such of his members as may render him the less able in fighting, either to defend himself, or to annoy his adversary." 4 Blackstone, Commentaries 205 (1769), *quoted in United States v. Cook,* 149 U.S.App.D.C. 197, 198, 462 F.2d 301, 302 (1972); *see also* W. La-Fave & A. Scott, Handbook on Criminal Law § 83 (1972); 2 Bishop's Criminal Law § 1001 (9th ed. 1923). This crime preserved the king's right to the able military services of any of his subjects. Thus, mayhem was a crime against the king, limited to injuries rendering the victim a less efficient warrior.

Consequently, cutting off the victim's ear or nose did not constitute mayhem in the common law because it resulted merely in disfigurement rather than disablement. This being the case, it is reported that when Sir John Coventry made some allegedly scurrilous remarks on the floor of Parliament about the social conduct of his highness, Charles II, avenging burghers accosted him on the street and slit his nostrils. Of course, such conduct was not a crime under the common law definition of mayhem since one with a slit nose presumably may still fight for the king.

Parliament accordingly passed the so-called Coventry Act, which made it a felony for anyone who

shall *of malice aforethought,* and by lying in wait, unlawfully cut out or disable the

---

2. In *United States v. Cook,* 149 U.S.App.D.C. 197, 462 F.2d 301 (1972), the only case to interpret § 22–506, the court resorted to common law understanding to determine the injuries required for a mayhem prosecution.

3. D.C.Code 1973, § 49–301 provides:
The common law, all British statutes in force in Maryland on February 27, 1801, the principles of equity and admiralty, all general Acts of Congress not locally inapplicable in

the District of Columbia, and all Acts of Congress by their terms applicable to the District of Columbia and to other places under the jurisdiction of the United States, in force in the District of Columbia on March 3, 1901, shall remain in force except in so far as the same are inconsistent with, or are replaced by, some provisions of the 1901 Code. (Mar. 3, 1901, 31 Stat. 1189, ch. 854, § 1.)

tongue, put out an eye, slit the nose, cut off a nose or lip, or cut off or disable any limb or member of any other person, *with intent to maim or disfigure* him. [4 Blackstone, Commentaries 207 (emphasis added), *quoted in State v. Deso*, 110 Vt. 1, 1 A.2d 710 (1938).]

This act did not displace the common law of mayhem but rather extended the crime to include intentional disfigurement and provided an increased penalty for intentional maiming. Thus, in English law, the crime of disfigurement required specific intent, while mayhem did not.

The modern Maryland statute on disfigurement closely resembles the Coventry Act.

Every person ... who shall be convicted of the crime of cutting out or disabling the tongue, putting out an eye, slitting the nose, cutting or biting off the nose, ear or lip, or cutting or biting off or disabling any limb or member of any person, *of malice aforethought, with intention in so doing to mark or disfigure such person*, shall be guilty of a felony .... [Md.Ann.Code art. 27, § 385 (1976 Supp.) (emphasis added).]

This statute is derived from a 1793 law which restates the Coventry Act, with its requirement of specific intent. *See* Laws of Maryland, Made and Passed at a Session of Assembly [1793, ch. 57, § 121]. Consequently, this codification by Maryland of the Coventry Act in 1793 establishes the Act as a "British statute [ ] in force in Maryland on February 27, 1801" which D.C. Code 1973, § 49–301, makes a part of the common law of the District of Columbia. Indeed, The Compiled Statutes in Force in the District of Columbia 1887–'89, ch. 16, § 33 (compiled by Albert and Lovejoy, 1894), reveal that the 1793 Maryland Act, ch. 57, § 12, provided for proof of an intent to "maim or disfigure."

■ Accordingly, the common law of the District of Columbia, by providing for imprisonment of "[e]very person convicted of mayhem or of maliciously disfiguring another," is a sentencing statute that incorporates two common law crimes: mayhem

and malicious disfigurement. As to the latter, therefore, § 22–506 reflects and preserves the common law history just discussed and, as a consequence, the requirement of specific intent to maim or disfigure.

The common law is not inconsistent with or replaced by any provisions of the D.C. Code. *See* § 49–301; note 3 *supra*. The language "maliciously disfiguring" is a legal term of art, adopted from the common law, which accordingly incorporates by reference the requirements of malice and specific intent. Contrary to the interpretation of the trial court, the statute does not create a new crime of "disfigurement" for which the prosecution is required to prove only that the act was committed "maliciously." There is no evidence from the language of the statute or the legislative history that the drafters intended to change or delete the common law requirements when they drafted § 22–506.

Nor are we convinced that subsequent case law has modified the common law requirement of specific intent. The government, citing *Brown v. United States*, 84 U.S.App.D.C. 222, 171 F.2d 832 (1948), and *Cook, supra*, argues that mayhem and malicious disfigurement have merged into a single class of general intent crimes, differentiated only by the type of injury inflicted. We disagree.

In *Brown, supra* at 223, 171 F.2d at 833, the court, applying the common law definition, agreed that "so long as the act of mayhem is done maliciously and wilfully, a specific intent is not necessary to constitute the crime." The court did not, however, reach the issue of intent for malicious disfigurement. Similarly, in *Cook, supra*, the court was not presented with the issue of intent but rather with the question of what injuries were legally sufficient to support a conviction under § 22–506 for either mayhem or malicious disfigurement. While the court recognized that "a shift in emphasis from the military and combative effects of the injury to the preservation of the human body in normal functioning" had occurred in the common law, it did not, as the

government contends, abrogate the distinction between "mayhem" and "maliciously disfiguring another." *Id.* at 199, 462 F.2d at 303.

The distinction we recognize, while derived from another era, remains rational today and thus could not be called manifestly contrary to congressional intent. The historical justification for the distinction between disfiguring injuries which diminish military prowess (mayhem) and those which do not do so (malicious disfigurement) is quite obviously outmoded; but the two discrete crimes, with their differing degrees of intent, still serve discernible functions. According to § 22–506, *supra*, the two crimes carry the same penalty, not more than ten years' imprisonment. The act of mayhem, however, is so egregious that sufficient intent justifiably may be inferred from malicious and wilful commission of the act. As the court said in *Brown, supra* at 223, 171 F.2d at 833:

> If an assault be so malicious and wilful as to result in the loss of an eye or a leg or an arm, it is immaterial to the gravity of the offense that the assailant had no specific intention of depriving his victim of the eye, or of the arm, or of the leg.

In contrast, disfigurement can result from a relatively minor assault. The specific intent requirement accordingly serves to separate the less serious, though criminal, act which results in a permanent injury from the calculated and truly heinous act of mayhem.

█ Having determined that one element of malicious disfigurement under § 22–506, *supra*, is specific intent to disfigure, we conclude that the trial court's instruction constitutes reversible error.[4] While the record contains evidence sufficient for a find-

ing of specific intent to disfigure, we must reverse and remand for the jury to consider that issue (along with the others) under proper instructions.

B. In addition to challenging the propriety of the court's instruction on the required state of mind for malicious disfigurement, appellants claim the court erroneously instructed the jury on the definition of disfigurement.[5] On this issue, appellant Perkins had requested that the court instruct the jury that they must find:

> 2. That the injury substantially disfigured the complainant, such that other citizens of the community would be likely to be momentarily shocked or revulsed by complainant's appearance;
>
> 3. That the disfigurement is permanent, that is, that the disfigurement will not disappear over the passage of time, and that the disfigurement cannot be removed through ordinary medical procedures.

In instructing the jury, however, the court stated that the government had to prove beyond a reasonable doubt:

> that as a result of the injury the complaining witness was permanently disfigured.

The court went on to explain that permanent disfigurement

> means that the person is appreciably less attractive or that a part of his body is to some appreciable degree less useful or functional than it was before the injury.

█ The court's instruction fully comported with the definition of disfigurement set forth in *Cook, supra* at 199, 462 F.2d at 303, where the court noted that a violation of D.C.Code 1973, § 22–506, "requires permanence of injury or *disfigurement in some*

---

4. We recognize that appellant Hamilton did not raise an objection to the trial court's instruction at the time of trial. The government contends that, absent an objection, his case should be reviewed according to a "plain error" test. *Watts v. United States*, D.C.App., 362 A.2d 706 (1976) (en banc). Since counsel for appellant Perkins raised an appropriate objection, and the prosecution and the trial court had full opportunity to address the question, we review both cases according to the harmless error

standard. *See Williams v. United States*, D.C. App., 382 A.2d 1, 7 n.12 (1978).

5. Appellants also contend there was insufficient evidence that the victim suffered permanent disfigurement as a result of the attack to support their convictions for malicious disfigurement. In light of our ruling on the specific intent issue, we find it unnecessary to reach this contention.

*appreciable form*" (emphasis added). The court observed:

> To disfigure is "to make less complete, perfect or beautiful in appearance or character" and disfigurement, in law as in common acceptance, may well be something less than total and irreversible deterioration of a bodily organ. [*Id.* at 200, 462 F.2d at 304 (footnotes omitted).]

In instructing the jury as it did, the trial court was correct in rejecting that portion of appellant Perkins' proposed instruction suggesting that disfigurement was not permanent if it could be removed through medical procedures. As the court noted in *Cook, supra*:

> There have long been indications that the infliction of an injury forbidden by a mayhem-type statute may constitute an offense notwithstanding the possibility that alleviation of the injury is medically possible. [*Id.* at 200 n.23, 462 F.2d at 304 n.23.]

*Accord,* R. Perkins, Perkins on Criminal Law 187–88 (2d ed. 1969).

■ C. In summary, reflecting the common law definition, the proper instruction for malicious disfigurement should be:

> The essential elements of the offense of malicious disfigurement, each of which the Government must prove beyond a reasonable doubt, are:
>
> (1) That the defendant inflicted an injury on the complaining witness,
>
> (2) That, as a result of the injury, the complaining witness was permanently disfigured,
>
> (3) That, at the time the defendant inflicted the injury, he specifically intended to disfigure the complaining witness,
>
> (4) That, when he inflicted the injury, the defendant was acting with malice.
>
> To be permanently disfigured means that the person is appreciably less attractive or that a part of his body is to some appreciable degree less useful or functional than it was before the injury. "Malice" is a state of mind or heart regardless of the life and safety of others.

It may also be defined as the condition of mind which prompts a person to do wilfully, that is on purpose without adequate provocation, justification or excuse, a wrongful act the foreseeable consequence of which is a serious permanent disfiguring bodily injury to another.

### III

■ Appellants also contend that their assault with a dangerous weapon convictions merged with their malicious disfigurement while armed convictions and, therefore, the judge erred in denying their motion to vacate the former convictions. The argument is flawed in two ways. First, it is clear from the record that the jury found appellants guilty of assault with a dangerous weapon as a lesser included offense of either the assault with intent to kill while armed count or the assault with intent to commit robbery while armed count. By specific request the lesser included offense charge was limited to either of those counts. Since the episode occurred over a long period and numerous weapons were used before and after the demand for money, it cannot be said that events were so unitary as to present a situation where merger is arguable. The jury could well have viewed the lesser included offense as stemming from beatings separate from those deemed proved under the disfigurement count. *Ball v. United States*, D.C. App., 429 A.2d 1353, 1361 (1981). Indeed, the request limited the lesser included offense instruction so as to preclude it under the disfigurement count. As the trial judge concluded:

> [T]his jury was not charged on assault with a dangerous weapon as a lesser included offense of malicious disfigurement while armed and the verdict of this jury does not reflect and could not reflect a finding that the assault with a dangerous weapon for which they found Mr. Perkins guilty is the assault which underlies the malicious disfigurement charge.

■ Second, if we assume for purposes of argument that the event was unitary, since each offense requires proof of a fact that

the other does not, merger is legally impossible, *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); *accord, Jones v. United States*, D.C.App., 401 A.2d 473, 475 (1979). Assault with a dangerous weapon requires proof that the weapon actually was used in the assault while malicious disfigurement, with the punishment enhancement element of being armed, requires only proof that the accused was armed or had a dangerous weapon readily available. *See* D.C.Code 1973, § 22–3202. Also, malicious disfigurement while armed requires proof of specific intent and permanent disfigurement while assault with a dangerous weapon does not require proof of either fact.

## IV

■ Finally, appellant Hamilton asserts that the court erred when it failed sua sponte to sever his trial from that of Perkins on the ground that the evidence presented against him was minimal compared to the evidence presented against his codefendant. Since Hamilton never made a motion to sever, we will reverse the convictions only if the failure to sever sua sponte amounted to plain error so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial. *Cunningham v. United States*, D.C.App., 408 A.2d 1240, 1243 (1979). Such prejudice exists where the evidence against appellant is *de minimis* when compared to the evidence against his codefendant. *Christian v. United States*, D.C.App., 394 A.2d 1, 21 (1978), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979).

■ In this case, three different witnesses identified Hamilton and described his participation in the attack on Quarles. One witness identified him from a photo array and from a lineup photo, and also made an in-court identification. He also testified to having seen Hamilton stab and beat Quarles. Another witness identified appellant in a photo array and in court, and also testified to having seen Hamilton beat Quarles. Yet another witness identified Hamilton as a person he saw running from the basement with Perkins. Under the circumstances, failure to sever Hamilton's trial sua sponte was not plain error.

## V

Accordingly, we affirm the judgments of conviction for assault with a deadly weapon but reverse and remand for a new trial on the charges of malicious disfigurement.

*So ordered.*

NEBEKER, Associate Judge, dissenting:

I cannot agree that the malicious disfigurement proscription of D.C.Code 1973, § 22–506 is simply a "sentencing statute" that preserves the requirements of specific intent and malice. The malicious disfigurement proscription differs from the Coventry Act and the Maryland Act (Md.Ann. Code art. 27, § 385 (1976 Supp.)) by deleting the specific intent element and substituting the element of malice which is a less arduous element than specific intent or malice aforethought. *Burge v. United States*, 26 App.D.C. 524 (1906); *Hamilton v. United States*, 26 App.D.C. 382 (1905). In my view that dispels any notion that specific intent need be proved. *See* W. LaFave & A. Scott, Handbook on Criminal Law § 83 at 616 (1972); *see, e.g.,* Wis.Stat.Ann. § 940.21 (West); *see also Charles v. United States*, D.C.App., 371 A.2d 404, 411 (1977) (malicious destruction of stolen property); *Nichols v. United States*, D.C.App., 343 A.2d 336, 341 (1975) (malicious destruction of property); *Curry v. United States*, D.C. App., 322 A.2d 268 (1974) (malice for second-degree murder); *United States v. Hinkle*, 159 U.S.App.D.C. 334, 487 F.2d 1205 (1973) (malice in homicide instruction). The words of the statute, being a substantive change or repeal of the earlier proscription, should be construed in their ordinary sense and with the legal meaning commonly attributed to them. *United States v. Young*, D.C.App., 376 A.2d 809, 813 (1977); *United States v. Thompson*, D.C.App., 347 A.2d 581, 583 (1975). The only explanation for this holding lies in a penchant to make criminal law enforcement more complex and difficult without achieving any good end.