Mercedes DUVALLON, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

No. 83–1468.

District of Columbia Court of Appeals.

Submitted Feb. 22, 1985.
Decided Oct. 3, 1986.

Mercedes Duvallon, pro se.

Inez Smith Reid, Corp. Counsel at the time brief was filed, John H. Suda, Principal Deputy Corp. Counsel at the time brief was filed, Charles L. Reischel, Deputy Corp. Counsel, and Michele Giuliani, Asst. Corp. Counsel, Washington, D.C. were on brief, for appellee.

Before PRYOR, Chief Judge, and NEWMAN and FERREN, Associate Judges.

NEWMAN, Associate Judge:

When she was arrested and charged with indecent exposure in violation of D.C. Code § 22–1112(a) (1981), Ms. Duvallon was engaged in a protest directed to the Supreme Court of the United States because of what she deemed to be the denial of her federal constitutional rights, both by the courts of

the United States and the courts of Florida. At trial, the government proved that Duvallon intentionally exposed her bare buttocks to public view. She was convicted as charged. She contends the statute, as written, does not interdict the public exposure of the bare buttocks. We agree and reverse.[1]

The facts in the case are undisputed. On October 14, 1983, at approximately 10:45 a.m., Duvallon approached the plaza at the Supreme Court of the United States. She wore a cardboard sign around her neck which covered the front of her body from the neck to below the knees. Duvallon removed her clothing and began walking back and forth on the plaza with her cardboard sign held in front of her body. The sign contained the following message:

Petition for Rehearing to the Supreme Court of the United States:

This is the alleged "crime" for which I am facing an illegal incarceration of sixty (60) days in case no. 82–6534 after denial of certiorari. The opinion of the Florida First District Court of Appeal has firmly established my innocence. Contrary to the opinion of the Eleventh Circuit Court of Appeals there is no conflict to be resolved by the Florida Supreme Court.

Wherefore, in the name of Jehovah, God of Truth and Justice, I move the court to perform its function and grant my petition.

Respectfully submitted,
Mercedes Duvallon [2]

Duvallon was arrested and charged with indecent exposure. Her case was heard by Commissioner Treanor in accordance with D.C.Code § 11–1732(c) (Supp.1986).[3] At trial the arresting officers testified that all they could see was a view of the back (including the buttocks) and sides of the body (including the sides of the breasts); they could not see genitalia or the front of the breasts. The officers also testified that at no time did Duvallon make any lewd or obscene gestures. The government called no other witnesses. She was convicted as charged.

Ms. Duvallon's actions offend individual senses of propriety, modesty and self-respect. But this court is not asked to decide whether or not Ms. Duvallon violated notions of personal modesty or propriety. Instead we are simply called upon to apply the rule of law and decide whether she broke the law. To answer this question, we search neither our own standards of morality nor standards of dress but rather the rule of law. An examination of decisional law, treatises, and basic principles of statutory construction leads inexorably to the conclusion that public exposure of the bare buttocks is not a violation of D.C.Code § 22–1112(a).

I

Insofar as is relevant to this appeal, D.C. Code § 22–1112(a) (1981) forbids anyone " ... [from making] ... any ... indecent exposure of his or her person...." To resolve this appeal, we must determine the meaning of the term "person", the exposure of which is prohibited.

In *District of Columbia v. Garcia*, 335 A.2d 217 (D.C.1975), we held that the inde-

---

1. D.C.Code § 22–1112(a) (1981) provides:

It shall not be lawful for any person or persons to make any obscene or indecent exposure of his or her person, or to make any lewd, obscene, or indecent sexual proposal, or to commit any other lewd, obscene, or indecent act in the District of Columbia....

Duvallon also contends that the statute is unconstitutionally vague as applied to her and that it violates her First Amendment rights of free speech and religion. We do not decide these issues based on our holding.

2. Duvallon was protesting the Supreme Court's denial of certiorari in a separate case where she was convicted of disturbing the peace in Florida for protesting in the same manner. *See Duvallon v. Florida*, 694 F.2d 725 (11th Cir.1982).

3. D.C.Code § 11–1732(c) allows, inter alia, a hearing commissioner to make findings and recommendations in criminal cases with the consent of the parties. This becomes a final order of the Superior Court when approved by a judge.

cent exposure clause of § 22–1112(a) was a codification of the common law crime of indecent exposure and cited to 50 Am. Jur.2d *Lewdness, Indecency and Obscenity* §§ 17–18 (1970), and 67 C.J.S. *Obscenity* § 5 (1950). *Garcia, supra,* 335 A.2d at 222 n. 16. This construction is in accordance with principles long established by this court that "[i]n the absence of a statutory definition of the elements of a crime, the common law definition is controlling." *Perkins v. United States,* 446 A.2d 19, 23 (D.C.1982); *Clark v. United States,* 418 A.2d 1059, 1061 (D.C.1980); *United States v. Bradford,* 344 A.2d 208, 213 (D.C.1975); *see also Saunders v. First National Realty Corporation,* 245 A.2d 836, 838 (D.C. 1968), *rev'd on other grounds,* 138 U.S. App.D.C. 369, 428 F.2d 1071 (1970) ("No statute is to be construed as altering the common law, farther than its words import. It is not to be construed as making any innovation upon the common law which it does not fairly express.") (citations omitted).

In American Jurisprudence, which *Garcia* cites, the common law crime of indecent exposure is defined as "the wilful and intentional exposure of the private parts of one's body in a public place in the presence of an assembly...." 50 AM.JUR.2d, *supra,* at § 17. Corpus Juris Secundum, which *Garcia* also cites, defines the offense as "the exhibition of those private parts of the person.... The purpose of such laws is to protect the public from shocking and embarrassing displays of sexual activity...." 67 C.J.S. *Obscenity* § 10 at 49–50 (1978). Further, "[c]onviction of the offense requires proof [that one] ... intended by his

conduct to direct public attention to his *genitals....*" *Id.* § 10 at 50 (emphasis added).

The common law of the District of Columbia consists of the common law of Maryland and the British statutes in force in Maryland in 1801, unless inconsistent with provisions of our codes. *Perkins, supra,* 446 A.2d at 23; *see also* D.C.Code § 49–301 (1981). The Maryland courts have held that "[t]he authorities ... cited are in substantial accord that at the common law indecent exposure was the wilful and intentional exposure of the private parts of one's body in a public place in the presence of an assembly." [4] *Dill v. State,* 24 Md.App. 695, 697, 332 A.2d 690, 693 (1975).[5]

Neither *Dill* nor other Maryland decisions define "private parts" within the meaning of the common law offense of indecent exposure. Thus, we must examine other common law authorities to define this term.[6]

## II

English common law cases compel the conclusion that indecent exposure was limited to the exposure of genitals. These cases repeatedly state that the defendant exposed her or his "private parts" or "person." *See, e.g., Reg. v. Webb,* 3 Cox C.C. 183 (1848) (indictment states that Webb did "indecently and wilfully expose and exhibit his private parts, naked and uncovered, in the presence of Mary Ann ..."); *Reg. v. Thallman,* 9 Cox C.C. 388 (1863) (indictment charges that Thallman did "indecently expose his person and private parts

---

4. This language is identical to the definition quoted from 50 AM.JUR.2D § 17, *supra.*

5. *Dill* cites to the following authorities: L. HOCHHEIMER, CRIMINAL LAW § 741, at 453 (1st ed., 1897); CLARK & MARSHALL, LAW OF CRIMES, § 11.08, at 779 (7th ed. 1967); R. PERKINS, CRIMINAL LAW 395–96 (2d ed. 1969); 2 WHARTON'S CRIMINAL LAW AND PROCEDURE § 784, at 625–27 (Anderson ed. 1957); Annot., 94 A.L.R.2d 1353 [1964]. Annot., 93 A.L.R. 996 [1934]. A review of these authorities shows they are properly cited by the *Dill* court.

6. We note that in all of our opinions dealing with the indecent exposure statute, where the conduct involved can be discerned from the opinion, exposure of genitalia was present. *See, e.g., Selph v. District of Columbia,* 188 A.2d 344 (D.C.1963); *Hearn v. District of Columbia,* 178 A.2d 434 (D.C.1962); *Campbell v. District of Columbia,* 172 A.2d 557 (D.C.1961); *Peyton v. District of Columbia,* 100 A.2d 36 (D.C.1953); *Davenport v. United States,* 56 A.2d 851 (D.C. 1948).

naked"); *see also* 4 W. BLACKSTONE, COMMENTARIES \*169 ("persons wilfully, openly, lewdly, and obscenely exposing their persons in any street or public highway, or in the view thereof, or in any place of public resort with intent to insult any female" were rogues and vagabonds) (*quoted in Dill v. State, supra,* 24 Md.App. at 698, 332 A.2d 690, 693 n. 2).

Significantly, the word "person" has been held to be a euphemism for the penis. *See Evans v. Ewels,* [1954] 2 All E.R. 22.[7] In *Evans,* the Queens Bench division was faced with the question of whether or not Evans' exposure of his lower abdomen near his genitals constituted indecent exposure under section four of the Vagrancy Act of 1824. The Vagrancy Act prohibits a man from "wilfully, openly, lewdly and obscenely exposing his person ... with intent to insult any female." Any man guilty of this crime "shall be deemed a rogue and a vagabond." The court found that the exhibition of the lower abdomen was not indecent exposure.

It seems to me that at any rate today, and indeed by 1824, the word "person" in connection with sexual matters had acquired a meaning of its own, a meaning which made it a synonym for penis. *Evans v. Ewells, supra,* 2 All E.R. at 24.[8] The *Evans* holding has considerable support in English caselaw.[9] In *Reg. v. Wood,* 14 Cox C.C. 46 (1877), Wood was convicted of raping Emelia Wild. Wild testified "how Wood had come into the house, had committed this assault upon her by *insertion of his person....*" (Emphasis added). In *Reg. v. Orchard and Thurtle,* 3 Cox C.C. 248, 251 (1853), the court held that in a public urinal, "[e]very man must expose his *person* who goes there for a proper purpose." (Emphasis added). In *Reg. v. Wellard,* 15 Cox C.C. 559 (1884), Wellard took seven or eight girls down to a marsh and "exposed his *person....*" (Emphasis added). When some local boys came upon this

**7.** In *Norton v. Rylands* (1971), 3 C.L.Y. para. 61, the Devonshire Quarter Sessions court came to the opposite conclusion. In *Evans,* the Queen's Bench declined to follow this decision, which was arrived at by a lower court.

**8.** In light of this language, it is significant that our statute remains unchanged since its adoption in 1892. *See* 27 Stat. 324, ch. 320, § 9 (July 29, 1892).

**9.** The *Evans* opinion suggests that the common law crime of indecent exposure was not limited to genital display, unlike the Vagrancy Act. For support of this proposition, the court quoted a passage from SMITH & HOGAN, CRIMINAL LAW 319 (2d ed. 1969).

However, an examination of Smith & Hogan's sources and pre-Victorian case law reveals no support for this proposition. CRIMINAL LAW states:

It has been suggested, though there is no authority on this point, that there is another limitation on this [Vagrancy Act] offence *which is not applicable to the common law offence*—that is, that "person" means "genital organ" and ... "the exposure of the backside is not within this section."

SMITH & HOGAN, *supra* at 319 (quoting RADZINOWICZ, SEXUAL OFFENCES 427 (1957)). Nothing in Radzinowicz's SEXUAL OFFENCES supports the proposition that the exposure of the buttocks was a common law offense or that "person" had a broader common law meaning than the Vagrancy Act definition. Significantly, in their next edition, Smith & Hogan revised this section to read simply: "[u]nlike the common law offence this crime is limited to exposure by a male to a female and requires a specific intent to insult. The word 'person' means 'penis'...." SMITH & HOGAN, CRIMINAL LAW 356 (3d ed. 1973). This edition completely dropped the earlier suggestions that the common law crime of indecent exposure included exposure of the buttocks and that "person" had a broader meaning at common law.

Moreover, Blackstone's use of the word "person" implies that it was used as a euphemism for penis at a much earlier time. *See supra* text at 726. It should also be noted that in England, the "common law supplies a certain number of general principles and leading definitions of crimes." 2 STEPHENS, A HISTORY OF CRIMINAL LAW IN ENGLAND 188 (1883). Ordinarily, the statutory definition of a crime is the same as the common law definition. In the absence of authority to the contrary, it can reasonably be inferred that the Vagrancy Act's definition of "person" is the same as its common law definition.

It is also significant that in some of the English cases using the term "person" the defendants were indicted for the common law crime of indecent exposure and not under the Vagrancy Act. *See Reg. v. Orchard & Thurtle, supra,* 3 Cox C.C. at 248; *Reg. v. Thallman, supra,* 9 Cox C.C. at 388.

scene, "[the] boys saw nothing improper, as the prisoner had turned round on their approach, and was lying on his stomach." *Id.* at 560. It can easily be inferred from this factual statement that Wellard exposed his penis to the young girls. *See also Reg. v. Thallman, supra,* 9 Cox C.C. at 389 ("He was almost entirely naked, and exposed his *person.*") (emphasis added); *Reg. v. Eliot,* 169 Eng.Rep. 1322 (1861) (defendants fornicated in public and "unlawfully, wickedly and scandalously did expose ... the bodies and *persons* of them") (emphasis added); *Reg. v. Reed,* 12 Cox C.C. 1, 2 (1871) (defendants unlawfully and indecently exposed "their bodies and *persons* naked and uncovered" in front of ladies) (emphasis added).

American common law cases are in accord with those of England. In *State v. Moore,* 194 Or. 232, 238, 241 P.2d 455, 459 (1952), in discussing the term "private parts" as applied to a female, the court said: "It is hornbook law that whenever the term 'privates or private parts' are used as descriptive of a part of the human body, they refer to the genital organs." In *Jones v. State,* 7 N.C.App. 166, 171 S.E.2d 468 (1970), the court held that private parts means genitals, those portions of the human anatomy used in the reproductory process. *Accord State v. Crenshaw,* 61 Hawaii 68, 69, 597 P.2d 13, 14 (1979); *Martin v. State,* 534 P.2d 685 (Okla.Crim.App. 1975); *State v. Dennison,* 72 Wash.2d 842, 435 P.2d 526 (1967); *Pendell v. State,* 158 Tex.Crim. 119, 253 S.W.2d 426 (1952).

Our statute refers to the " ... indecent exposure of *his* or *her* person...." (emphasis added). It is the indecent exposure of the comparable portions of the male and female anatomy that constitutes the crime. In other words, the indecent exposure of human genitalia is the offense. Since Ms. Duvallon did not expose her genitals, she did not violate § 22–1112(a).[10]

---

**10.** To construe the statute as urged by the District of Columbia would raise an issue of vagueness. *See Bouie v. City of Columbia,* 378. U.S. 347, 352, 84 S.Ct. 1697, 1701, 12 L.Ed.2d 894 (1964) (A "deprivation of the right of fair warn-

ing can result not only from vague statutory language but also from unforeseeable and retroactive judicial expansion of narrow and precise statutory language.").

*Reversed and remanded for entry of a judgment of not guilty.*

PRYOR, Chief Judge, dissenting:

The circumstances of this case present a new question of statutory interpretation arising under the District of Columbia indecent exposure statute, D.C.Code § 22–1112(a) (1981). By its holding, the court employs a narrow anatomical definition of the behavior in question. Because I adopt a broader standard, I dissent.

Appellant, Ms. Duvallon, in broad daylight, approached the plaza of the Supreme Court, fully clothed, with a sign hanging around her neck. She undressed completely, and then walked back and forth, in front of the Supreme Court, nude except for a sign which prevented a frontal view of her breasts and her genital area. The sides of her breasts, as well as her entire buttocks were at all times clearly visible to the police officers and other persons in the immediate vicinity.

Appellant asserts that she cannot be prosecuted for this conduct because the District's indecent exposure statute is merely a codification of the common law, and under the latter, the prohibition against indecent exposure purportedly does not preclude a person from intentionally exposing his or her buttocks to public view. More, specifically, it is urged that the scope of our indecent exposure statute is inextricably intertwined with the most common definition of "private parts," such that "private parts" is deemed synonymous with genitals.

At common law the crime of indecent exposure is defined to include any "exposure of the entire person, or parts that should not be exhibited." *Messina v. State,* 212 Md. 602, 605, 130 A.2d 578, 580

(1957); [1] *see State v. Borchard,* 24 Ohio App.2d 95, 99, 264 N.E.2d 646, 650 (1970); 67 C.J.S. § 10, at 49 ("indecent exposure is the exhibition of those private parts of the person which instinctive modesty, human decency, or self-respect requires shall be customarily kept covered in the presence of others"). The underlying purpose of the prohibition against indecent exposure is straightforward: to protect the public from being confronted in public places by annoying, shocking, or embarrassing displays of nudity or sexual activity. *See Hearn v. District of Columbia,* 178 A.2d 434, 438 (D.C.1962); 67 C.J.S. § 10, at 49; II J. BISHOP, NEW CRIMINAL LAW § 1125, at 671 (8th ed. 1892).

Many of the decisions in this area have resolved related but different questions: whether the exposure of genitals, specifically, was a violation of law, *see Davenport v. United States,* 56 A.2d 851 (D.C.1948); *Truet v. State,* 3 Ala.App. 114, 57 So. 512 (1912); whether the offensive conduct was sufficiently open to public view, *Messina v. State, supra; Gilmore v. State,* 118 Ga. 299, 45 S.E. 226 (1903); and lastly whether the conduct involved the requisite intent, *Davenport v. United States, supra,* 56 A.2d at 852; *Case v. Commonwealth,* 313 Ky. 374, 231 S.W.2d 86 (1950).

Further, it should be noted that in contrast to the statutes interpreted in most of these cases, D.C.Code § 22–1112(a) does not speak of "private parts" at all, but by its language prohibits an individual's making of "any obscene or indecent exposure of his or her *person*" (emphasis added).

Thus, this case presents, for the first time in the District of Columbia, the question whether the naked exhibition of parts of the body, other than genitalia, constitutes unlawful exposure within the meaning of our statute.

As the opinions in this instance reflect, reasonable minds may differ as to how our statute should be interpreted. Given the

common law origin of the exposure prohibitions and the general purposes of such statutes, I find nothing in the long line of cited decisions which requires us to equate the exposure of one's "person" as meaning only the exposure of genitalia. Indeed, the latter behavior represents the most extreme form of violation.

In my view the broader interpretation of the statute is consistent with the common law, preserves the legislative intent, and gives adequate notice of the behavior which is proscribed.

Under the circumstances of this case, I would affirm.

Wade A. LANGLEY, Appellant,

v.

UNITED STATES, Appellee.

No. 84–1092.

District of Columbia Court of Appeals.

Argued July 9, 1986.
Decided Oct. 7, 1986.

---

1. The common law of the District of Columbia consists of the common law of Maryland and the British statutes in force in Maryland in 1801, unless inconsistent with provisions of our code. *Perkins v. United States,* 446 A.2d 19, 23 (D.C.1982); *see also* D.C.Code § 49–301 (1981).

J. Philip Kessel, Washington, D.C., for appellant.

Daniel S. Seikaly, Asst. U.S. Atty., with whom Joseph E. DiGenova, U.S. Atty., and Michael W. Farrell and Thomas J. Tourish, Jr., Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before PRYOR, Chief Judge, and FERREN and BELSON, Associate Judges.

FERREN, Associate Judge:

Appellant challenges his convictions on two counts each of kidnapping, D.C.Code § 22–2101 (1981), assault with intent to commit rape, *id.* § 22–501, and simple assault, *id.* § 22–504.[1] He claims the evidence was insufficient to support his conviction for assault with intent to commit rape. He also maintains the trial court erred in denying his request for an instruction on simple assault as a lesser-included offense of assault with intent to commit rape. Finally, appellant contends the trial court erred when it ruled, *in limine*, that even though appellant had not been sentenced for two felonies of which a jury recently had found him guilty, D.C.Code § 14–305 (1981) authorized the government

to impeach him with evidence of guilty verdicts which had not yet been reduced to final judgments of conviction. It is uncontested that, as a consequence, appellant declined to testify. We conclude the evidence of the assaults with intent to commit rape was sufficient for conviction, but we reverse and remand for a new trial because we agree with appellant on the impeachment issue. In view of our disposition, we need not address appellant's lesser-included-offense argument.

## I.

The government's evidence showed that on June 23, 1982, appellant and his two co-defendants, Miles and West, abducted the two complainants on Martin Luther King Avenue, S.E. The complainants had been waiting to cross the street when a car pulled up next to them and the driver asked one of the women for a match. When she tried to pass a book of matches through the front passenger window, the driver, Miles, told her it was broken. He opened the front door on the passenger side.

As this first complainant was waiting for return of the matches, she noticed that a fight had broken out nearby. While distracted, she reached into the car to retrieve the matches, but she was pulled into the front seat. The car sped off. The complainant begged to be let out, to no avail. As the car turned a corner sharply, she was thrown against Miles, who was still holding her arm. She then saw that the second complainant was in the back seat, held down by West, one of two men sitting there.

As the car sped down Interstate 295, the first complainant pleaded with Miles to let them out. At one point, Miles pulled over to the side of the road as if to comply, but when West shouted, "No, Roland," Miles sped up again. West said repeatedly to both women that they "were going to fuck" and began beating the second com-

---

**1.** The court sentenced appellant to concurrent prison terms of three to ten years for each count of kidnapping and of assault with intent to commit rape and of twelve months for each count of simple assault, all sentences to run consecutively to any other being served.

plainant with his fists because the women refused.

Appellant was the other man in the back seat. He began pulling the second complainant's pants down. She recalled that West got angrier as she fought back and claimed "that he was gonna fuck me or he was gonna kill me." West hit her in the face with a liquor bottle. The first complainant then heard West ask appellant for a gun, followed by the second complainant's saying, "Oh, God, he['s] got a gun." West then hit the second complainant with the gun. Immediately thereafter, appellant reached over the front seat and began pulling off the first complainant's clothes. He succeeded in tearing off her blouse and bra and was trying to pull off her pants when she began hitting him and Miles.

By this time, Miles had taken the Benning Road exit off 1–295, made another turn, and driven a short distance. West continued to beat the second complainant, who continued to resist until he pushed her out of the moving car. A half block later, Miles made a quick turn, and the front passenger door flew open. Working together, appellant and Miles pushed the first complainant out of the moving car. When she hit the ground, she saw the car back up as if the driver were trying to run her over. She rolled out of the way and ran toward a nearby apartment building for help.

The first complainant sought help from a man on the second floor landing of the building, Bobby Davis, who gave her his shirt. She then saw her abductors' car come down the street and identified it to Davis and others who had come out of the building. Moments later, a police car arrived with the second complainant. Her clothes were torn, and she was bleeding from her face, arms, and hands. As the first complainant began describing her abduction to the police, she heard Davis say, "That look[s] like the car." The police acted promptly and apprehended the three men. The first complainant identified all three at a showup conducted at the scene,

while the second complainant identified Miles as the driver.

A crime scene search officer processed the car for evidence. He testified that he had found a white bra strap on the front passenger seat, a white blouse on the right rear seat, and a laminated identification card belonging to the first complainant.

Appellant did not present any evidence. He relied instead on the testimony of his co-defendants, who claimed that the two women had entered the car voluntarily and had jumped out only after West noticed that money was missing from his pocket.

## II.

Appellant claims that the evidence was insufficient as a matter of law to support his convictions for assault with intent to commit rape. Specifically, he argues that there was "no evidence on which the jury could have concluded beyond a reasonable doubt that either [appellant] or his co-defendants possessed the ... state of mind required for conviction."

In evaluating a claim of insufficiency, we review the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact. *Hall v. United States,* 454 A.2d 314, 317 (D.C.1982); *Curley v. United States,* 81 U.S. App.D.C. 389, 392, 160 F.2d 229, 232, *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). We may reverse only when the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt. *Frendak v. United States,* 408 A.2d 364, 371 (D.C.1979).

To sustain appellant's convictions for assault with intent to commit rape, the evidence must permit a reasonable person to find beyond a reasonable doubt that appellant (1) assaulted the two complainants, (2) did so with the specific intent to have sexual intercourse with them, and (3) intended to achieve penetration of their sexual organs against their will "by using such force or threat of force as might be neces-

sary to overcome resistance or make further resistance useless." *United States v. Bryant*, 137 U.S.App.D.C. 124, 133, 420 F.2d 1327, 1336 (1969); Criminal Jury Instructions for the District of Columbia, No. 4.75 (3d ed. 1978). The necessary element of intent need not be proved directly "but may be inferred from the totality of the circumstances presented to the jury." *United States v. Jackson*, 183 U.S.App.D.C. 270, 273, 562 F.2d 789, 792 (1977); *Higgins v. United States*, 130 U.S.App.D.C. 331, 332, 401 F.2d 396, 397 (1968).

■ The evidence established that the women were forcibly abducted by appellant and his co-defendants and driven from Martin Luther King Avenue, S.E., to the area of 26th and Eye Streets, N.E. The first complainant testified that, as Miles was driving down I–295, West "was saying that we were going to fuck. He just kept saying over and over, and we were saying, no, we weren't." At about the time Miles turned off I–295 onto Benning Road, appellant reached over the front seat and began tearing at the first complainant's clothes. He succeeded in tearing off her blouse and bra and was attempting to take her pants off just before appellant and Miles pushed her out of the car.

Similarly, the second complainant testified that, from the moment she had been dragged into the back seat of the car, appellant and West held her there. Angered by her resistance, West began to beat her, first with his fists, then with a bottle, and finally with a gun. At about the time West told her "he was gonna fuck me or he was gonna kill me," appellant "was trying to pull my pants down, but I kept kicking him."

From this testimony and the corroborating physical evidence—bleeding, torn clothes, and clothing recovered from the car—the jury easily could have found that appellant's assaults were committed with the specific intent that he, or West (whom appellant aided and abetted), or both, have intercourse with the two women against their will, using whatever force was neces-

sary to accomplish it despite their resistance. *Bryant*, 137 U.S.App.D.C. at 133, 420 F.2d at 1336.

Appellant argues to the contrary, citing *Bryant, id.* at 131–32, 420 F.2d at 1334–35. He asserts the only reasonable inference from the evidence is that he and his cohorts had abandoned their effort to rape—that they manifestly had not intended to use the force necessary to accomplish that purpose because, when they encountered resistance, they pushed the complainants out of the car. Specifically, appellant claims in his brief that the third element of the crime was not established because the evidence showed, at most, "that the complaining witnesses were assaulted inside the car and that the initial motivation of this behavior was to obtain their consent to sexual intercourse with the men. In light of the resistance encountered, however, any original intention to have sexual intercourse was, in fact, abandoned without any outside interference." We disagree.

In the portion of *Bryant* on which appellant relies, the court stated there is no intent to commit rape "[w]hen a defendant intends to use the kind of 'force' that is enough in his mind to test the existence or persistence of a complainant's true intentions, but not enough to achieve sexual intercourse if she 'really' rejects him." *Id.* at 131, 420 F.2d at 1334. But this is not to say that, if an assailant fails to commit rape because the victim's resistance is especially fierce, his abandonment manifests a lack of intent forcefully to accomplish that purpose. The assailant's failure may merely mean that the victim's ability to fend off attack was superior to the assailant's ability to accomplish his objective. On the evidence here, the jury, which was properly instructed, reasonably could have found that appellant and his co-defendants manifestly intended rape—as evidenced by their accelerating attacks on the complainants—but that the complainants were simply too much for them. The jury need not have inferred that appellant and the others were simply testing the complainants'

"true intentions," *id.*, and ceased their attacks only because the complainants rejected the overtures.

## III.

Appellant also argues that the trial court erred in ruling on his motion *in limine* that, if he testified, the government could impeach him with evidence that a jury had found him guilty of two felonies for which he had not yet been sentenced. This was prejudicial error, he says, for as a consequence of that ruling he decided not to testify. The government responds, initially, that under the principle announced in *Luce v. United States*, 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984), appellant's failure to testify precludes our reviewing this issue on appeal. The government also asserts that, in any event, the court's ruling was proper.

### A.

On February 11, 1984, a jury found appellant guilty on two counts of rape and one count of assault with intent to commit sodomy in Criminal No. F 3666–82. He was not sentenced until April 13, 1984.[2] On March 29, 1984, the trial court in the present case heard argument on the question whether, if appellant testified at trial, the government could use the jury verdicts in the earlier case to impeach his credibility. The trial court then ruled that the government could ask appellant if he had been convicted of felony offenses in Superior Court on February 11, 1984, but could not elicit the nature of those offenses. Some time later, defense counsel announced that, because of the court's ruling, appellant would not testify.

**2.** This conviction is currently on appeal to this court. *Langley v. United States*, No. 84–467.

**3.** The majority in *Robinson v. United States*, 513 A.2d 218 (D.C.1986) did not reach this issue. It "decide[d] the case on the merits without reference to *Luce*." *Id.* at 221 n. 7.

### B.

In *Luce*, the Supreme Court held that, in order "to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." 469 U.S. at 43, 105 S.Ct. at 464. The Court decided *Luce* after appellant's trial. Even if *Luce* were otherwise applicable—an issue we do not address—we conclude that *Luce* would only apply prospectively. We adopt the reasoning of *Robinson v. United States*, 513 A.2d 218, 222, 223–24 (D.C.1986) (Ferren, J., dissenting).[3]

Accordingly, since no one questions that appellant declined to testify because of the court's ruling, he may challenge that ruling on appeal under the law of this jurisdiction at the time he presented his motion. *Johns v. United States*, 434 A.2d 463, 467–68 (D.C.1981); *United States v. Lipscomb*, 226 U.S.App.D.C. 312, 332–33, 702 F.2d 1049, 1069–70 (1983).

### C.

In this jurisdiction, the courts have understood, by reference to the statutory language, that a "conviction" for purposes of a sequence of impeachment statutes has meant a judgment of conviction based on a sentence. *Godfrey v. United States*, 454 A.2d 293, 305 (D.C.1982); *United States v. Lee*, 166 U.S.App.D.C. 67, 72, 509 F.2d 400, 405 (1974), *cert. denied*, 420 U.S. 1006, 95 S.Ct. 1451, 43 L.Ed.2d 765 (1975); *Thomas v. United States*, 74 U.S.App.D.C. 167, 169, 121 F.2d 905, 907 (1941); *Crawford v. United States*, 59 U.S.App.D.C. 356, 357, 41 F.2d 979, 980 (1930). Because this interpretation has been expressed in dicta, however, there is still a question whether imposition of sentence is an absolute prerequisite to the meaning of "conviction" for impeachment purposes under D.C.Code § 14–305 (1981).[4]

---

unde, but only if the criminal offense (A) was punishable by death or imprisonment in excess of one year under the law under which he [or she] was convicted, or (B) involved dishonesty or false statement (regardless of punishment).