**UNITED STATES of America**

v.

**Otis Melvin BRIDGES, aka
OB., Appellant.**

**UNITED STATES of America**

v.

**Denise HARLEY, aka Denise Jackson,
aka Denise Watson, aka
Negey, Appellant.**

Nos. 82–2482, 83–1116.

United States Court of Appeals,
District of Columbia Circuit.

Argued 24 May 1983.

Decided 23 Sept. 1983.

Certiorari Denied Feb. 21, 1984.
See 104 S.Ct. 1310.

---

Michael S. Frisch, Washington, D.C., appointed by this Court, for appellant in 82–2482.

Peter E. George, Washington, D.C., appointed by this Court, for appellant in 83–1116.

Ava J. Abramowitz, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Michael W. Farrell, Judith Hetherton, and Theodore A. Shmanda, Asst. U.S. Attys., Washington, D.C., were on the brief for appellee.

Before WILKEY and SCALIA, Circuit Judges, and WEIGEL,* Senior District Judge, United States District Court for the Northern District of California.

Opinion for the Court filed by Circuit Judge WILKEY.

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. 18 U.S.C. § 1623 (1976).

2. 18 U.S.C. § 1503 (Supp. V 1982). In addition, Harley was convicted and sentenced to three months, to run concurrently, on a related

WILKEY, Circuit Judge:

The appellants in this case, Otis Melvin Bridges and Denise Harley, were both convicted in the trial court of making false declarations before a grand jury[1] and obstruction of justice.[2] Each received consecutive three year sentences on each count. Both now appeal from the convictions; in addition, Harley challenges the imposition of consecutive sentences. We affirm the trial court.

On 3 September 1981 the Metropolitan Police Department received an anonymous tip that a burgundy Granada parked at the corner of Martin Luther King Avenue and Talbot Street held in its trunk 600 packages of heroin. The police responded promptly to the tip, dispatching no fewer than three police cruisers. At the scene the police found a red Thunderbird. The police observed the car briefly, then sought permission to search it from its owner. The owner, Denise Harley, at first acquiesced, then changed her mind and insisted that the police obtain a search warrant.

Officer Alfred McMaster impounded the car, so as to hold it until a search warrant could be obtained. Officer McMaster turned the keys to the car over to Officer James Carpenter, and instructed him to take the car to the 7th District Police Station. Carpenter testified at trial that he drove the car directly to the police station with no intervening stops.[3]

The presence of the appellants before this court results from a different story they have told about the progress of the car to the 7th Precinct. On the morning the car was impounded, Harley contacted an attorney, Kenneth Michael Robinson, and told him that she had witnessed a warrantless search of her car. Harley told Robinson that the police had stopped the car in route to the police station, and searched the trunk

---

charge of making a false report to the Metropolitan Police Department. D.C.Code, § 4–151.

3. *United States v. Bridges,* No. 82–2482, *United States v. Harley,* No. 83–1116, Trial Transcript [hereinafter Trial Transcript] at 236.

and glove compartment. Robinson told Harley that such a search would be improper, and Harley expressed a desire to enter a formal complaint.

Early that same afternoon, Robinson took Harley—along with Walter Stringer, Donny Wise and Otis Bridges—to the office of Assistant United States Attorney Paul Murphy. The four asked to testify before a federal grand jury about the alleged illegal search of Harley's car. Murphy agreed.

Murphy explained to the grand jury that his interest in the allegations was piqued by his express instructions to McMaster before the car was impounded to search it only after obtaining a warrant:

> [They] are out there, and they are willing to testify under oath that they saw the police pull her car over, and that they were behind in another car, and they watched the trunk come up and other policemen gather around and look in the trunk and search the car completely.
>
> Now, if that is the case, I won't have it, because I find that to be reprehensible, particularly—if it is true—particularly, if I just got off the phone and told them to do the right thing. It just really makes me angry.[4]

Murphy cited to the grand jury two possible jurisdictional bases for the grand jury inquiry: 21 U.S.C. § 841(a), a statute prohibiting drug trafficking, and the Fourth Amendment to the Constitution.[5]

Both appellants appeared before the grand jury that afternoon. According to Harley, she and her companions had followed her car to the police station. From their vantage point about a block behind, she said, they had witnessed the police stop the car near 15th Street and Mississippi Avenue, S.E. She testified that eight plainclothesmen, including Officer McMaster, surrounded the back of her automobile and opened the trunk for an inspection, while Officer Frederick McDonald searched the glove compartment.[6] Bridges' testimony differed only in minor details.[7]

In the middle of the grand jury testimony, Murphy spoke with Officer McMaster. McMaster denied that an illegal search had occurred. Instead, McMaster told Murphy, a proper search warrant had been secured at 2:00 p.m. and a legal search performed at 3:00 p.m. The search showed that the car contained no packets of heroin.

The grand jury took no formal action based on testimony provided by the volunteer witnesses.[8] Seven months later, however, Assistant U.S. Attorney Timothy J. Reardon interviewed both Donny Wise and Walter Stringer in connection with a case pending against Harley's husband, Darnell Jackson. Both Wise and Stringer independently told Reardon that the story about the illegal search had been fabricated. Both said that they had seen the car stopped, but that they had not witnessed an illegal search.[9]

Reardon presented both men to a new grand jury on 1 April 1982. Harley and Bridges were subsequently indicted, tried and convicted on charges of obstruction of justice and making false declarations before a grand jury. Harley was also convicted on a charge of making a false report to the Metropolitan Police Department. Both were acquitted of subornation of perjury. Both Harley and Bridges were sentenced to consecutive three year terms of imprisonment on the obstruction of justice and false declaration charges. Harley received a con-

---

**4.** Grand Jury Transcript, in re: Possible Violation of 21 U.S.C. 841(a), at 4; Brief and Appendix for Appellee [hereinafter Government Brief] Appendix B at 4.

**5.** *Id.* at 5.

**6.** Indictment at 3–7.

**7.** *Id.* at 9–11. Donny Wise also testified. Because of a shortage of time, Walter Stringer did not testify.

**8.** The police department did, however, apparently conduct an internal investigation of the charges. *See* Trial Transcript at 152–53.

**9.** Trial Transcript at 376 (Testimony of Assistant United States Attorney Timothy J. Reardon).

current thirty day sentence on the false report offense.

These appeals raise four issues: (1) whether the grand jury to which Harley and Bridges testified had jurisdiction to investigate the alleged illegal search; (2) whether the testimony of the two was material to the grand jury investigation; (3) whether photographs of the scene where the search purportedly took place were properly admitted; and (4) whether entering consecutive sentences for the false declarations and obstruction of justice convictions offends the Double Jeopardy Clause of the Constitution.

### I. GRAND JURY INVESTIGATION

■ Both appellants challenge the legitimacy of the grand jury investigation. Each charges that the alleged illegal search was not within the grand jury's jurisdiction.[10] Underlying this argument is the assumption that the alleged search of Harley's trunk could not possibly lead to criminal charges against the officers, and that any use of the grand jury to investigate the alleged search thus amounts to an abuse of the grand jury system.

We find that the grand jury investigation was legitimate. At the time the appellants asked to go before the grand jury, the information available to Assistant U.S. Attorney Murphy was very limited, but very disturbing: four apparently disinterested citizens accompanied by a member of the defense bar were accusing a police officer with a willful violation of the Fourth Amendment.

The alleged illegal search, taken alone, would itself be grounds for a grand jury investigation. The illegal search would constitute a civil rights violation remediable through the federal civil rights laws.[11]

Such unconstitutional abuses have led to criminal prosecutions within this jurisdiction.[12]

Taken in the context of the narcotics investigation—the investigation into the alleged presence of 600 packets of heroin in the trunk of the car—the illegal search would be even more troubling. If the search had occurred the way Harley and Bridges described it, it could have related to the narcotics investigation in a number of ways: it could have suggested the illegal "planting" of evidence; it could have suggested the theft or destruction of evidence. It could have rendered useless any evidence subsequently obtained through a legal search.

In these circumstances putting the volunteer witnesses before the grand jury was anything but an abuse of the grand jury process. The testimony proffered could lead directly to action against the officers; it could also lead to reconsideration of criminal charges against others based on investigations carried out by the officers involved. The U.S. Attorney had every right to investigate the charges made by the four volunteers, and that right was not abrogated because human prescience did not allow him to predict whether the investigation would ultimately lead to civil rights violations, to ancillary but critical aspects of an ongoing narcotics investigation, to neither, or to both.

### II. MATERIALITY

Both appellants argue that the government failed to establish properly that their testimony before the grand jury was material to the grand jury investigation. Appellant Bridges argues that the testimony of Assistant U.S. Attorney Murphy was insufficient to establish materiality.[13] Appellant

---

**10.** Brief and Appendix for Appellant Harley [hereinafter Harley Brief] at 12–18; Brief for Appellant Bridges [hereinafter Bridges Brief] at 20.

**11.** 18 U.S.C. §§ 241–242 (1976).

**12.** *See, e.g., United States v. Barker,* 546 F.2d 940 (D.C.Cir.1976); *United States v. Ehrlich-*

*man,* 546 F.2d 910 (D.C.Cir.1976), *cert. denied,* 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 570 (1977). We do not today decide whether such a suit could be defeated by defenses such as immunity.

**13.** Bridges Brief at 17–20.

Harley argues that the issue of materiality should have gone to the jury as a question of fact to be proved beyond a reasonable doubt, rather than being determined by the judge as a matter of law.[14]

■ The transcript indicates that the government introduced sufficient evidence to show that the false testimony was material. The testimony of Assistant U.S. Attorney Murphy at trial,[15] coupled with the introduction into evidence of the appellants' grand jury testimony,[16] was fully sufficient to show materiality.

■ We also reject appellant Harley's contention—unsupported by any case law—that the trial judge should not have ruled on the materiality issue.[17] The unanimous verdict of the federal courts has been that materiality is a question of law to be determined by the trial judge.[18] We see no sound reason to depart from that consensus.

### III. PHOTOGRAPHS

■ Both appellants also urge that the trial court erred in allowing into evidence photographs taken by Sergeant John Kornutick.[19] The photographs, taken for the trial, depicted a car parked in the general area where the alleged illegal search of Harley's car purportedly occurred. The intended effect of the photographs was to demonstrate that appellants could not possibly have witnessed a search from their claimed vantage point on 3 September 1981.

The core of appellants' argument is that the government did not satisfactorily establish "that the objects and situations portrayed" were a "true, accurate and faithful representation" of the circumstances existing at the time of the alleged search.[20] The record shows, however, that Sergeant Kornutick explained how, when and where he took the photographs.[21] Admission of the photographs in the circumstances was well within the discretion of the trial judge.[22]

### IV. CONSECUTIVE SENTENCES

■ Appellant Harley argues that imposing consecutive sentences for obstruction of justice and making false declarations to a grand jury offends the Double Jeopardy clause of the Constitution.[23] She relies on the established proposition that the Double Jeopardy clause prohibits "multiple punishments for the same offense."[24] The crux of her argument is that the two crimes—which comprise clearly distinct statutory elements—merge into the same offense on the facts of this case.[25]

The "same offense," as Justice Rehnquist has observed, is a "phrase deceptively sim-

14. Harley Brief at 18–21.

15. Trial Transcript at 38–77 (Testimony of Assistant United States Attorney Paul N. Murphy).

16. Id. at 86–87 (Testimony of Court Reporter Yvonne Pinette).

17. Harley Brief at 18–21.

18. Sinclair v. United States, 279 U.S. 263, 298, 49 S.Ct. 268, 273, 73 L.Ed. 692 (1929); United States v. Pickets, 655 F.2d 837, 840 (7th Cir.), cert. denied, 454 U.S. 1056, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981); United States v. Thompson, 637 F.2d 267, 268 (5th Cir.1981); United States v. Berardi, 629 F.2d 723 (2d Cir.), cert. denied, 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980); United States v. Giacolone, 587 F.2d 5 (6th Cir.1978), cert. denied, 442 U.S. 940, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979); United States v. Phillips, 540 F.2d 319, 328 (8th Cir.), cert. denied, 429 U.S. 1000, 97 S.Ct. 530, 50 L.Ed.2d 611 (1976); United States v. Paolicelli, 505 F.2d 971, 973 (4th Cir.1974); United States v. Lardieri, 497 F.2d 317 (3rd Cir.1974); United States v. Masters, 484 F.2d 1251, 1254 (10th Cir.1973).

19. Bridges Brief at 21; Harley Brief at 28 n. 19.

20. Bridges Brief at 21.

21. Trial Transcript at 135–184 (Testimony of Sergeant John Kornutick).

22. United States v. Blackwell, 694 F.2d 1325 (D.C.Cir.1982).

23. Harley Brief at 27–28, Reply Brief for Appellant Harley at 9–11.

24. North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969).

25. Reply Brief for Appellant Harley at 9–11.

ple in appearance but virtually kaleidoscopic in application."[26] Both the government and Harley agree that our starting point in freezing the kaleidoscope must be *Blockburger v. United States*.[27] In *Blockburger,* the Supreme Court set forth the controlling rule:

> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.[28]

The government argues without dispute from Harley that the texts of the two statutory provisions involved here are distinct under the *Blockburger* standard.[29] Each crime, as it appears in the criminal code, requires proof of a fact which the other does not.[30]

Harley argues, however, that we ought to frame our approach in terms of this court's decision in *United States v. Sampol*.[31] In *Sampol,* as here, the *statutory definitions* of the two crimes involved—misprision of a felony and making false statements to a grand jury—were distinct under the *Blockburger* standard. The *Sampol* court nonetheless held that imposition of sentences for each of the crimes would violate the double

jeopardy clause. The court justified its holding on the facts of the case: the same *evidence* possibly supported both convictions. The court explained its holding:

> In the ordinary case, violations of the two statutes in question do not amount to the same offense. Certainly there are many cases of misprision that would not involve proof of making false statements to a grand jury, and there are many imaginable cases of making false statements to a jury that would not entail concealment of a felony. . . .
>
> [But] *the government . . . admitted at oral argument that the proof of the false statements alone was sufficient proof of the misprision charge.* Under such circumstances *the false declarations offense admittedly included all the elements of the misprision charge.*[32]

In *Sampol* the court turned the focus of its scrutiny away from the formal elements of the offenses charged to the particular facts of the case. The scrutiny of the facts of the case revealed an ambiguity, however: in entering a conviction on the misprision charge, the jury might have relied at least in part on other evidence presented to them. It was sufficient for the *Sampol* court that the same facts *might* have supported both convictions:

---

**26.** *Whalen v. United States,* 445 U.S. 684, 700, 100 S.Ct. 1432, 1442, 63 L.Ed.2d 715 (1979) (Rehnquist, J., dissenting).

**27.** 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

**28.** *Id.* at 304, 52 S.Ct. at 182.

**29.** Government Brief at 53–54.

**30.** To establish an obstruction of the due administration of justice under 18 U.S.C. § 1503, the government must prove:
 1. that the defendant engaged in conduct or behavior or endeavored to engage in conduct or behavior;
 2. that the defendant engaged in such behavior corruptly and with specific intent;
 3. that the defendant's intent was to impede the due administration of justice.
*See, e.g., United States v. Tedesco,* 635 F.2d 902, 907 (1st Cir.1980), *cert. denied,* 452 U.S.

962, 101 S.Ct. 3112, 69 L.Ed.2d 974 (1981); *United States v. Gates,* 616 F.2d 1103, 1107 (9th Cir.); *United States v. Fasolino,* 586 F.2d 939, 940 (2d Cir.1978); *United States v. Jackson,* 513 F.2d 456, 460 (D.C.Cir.1975).
 On the other hand, to establish false declarations before a grand jury under 18 U.S.C. § 1623, the government must demonstrate:
 1. that the defendant testified under oath before the United States grand jury;
 2. that the testimony so given was false in one or more respects charged;
 3. that the false testimony concerned matters that were material to the grand jury investigation; and,
 4. that the false testimony was knowingly given as charged.
*United States v. Sampol,* 636 F.2d 621, 652–653 (D.C.Cir.1980) (per curiam).

**31.** 636 F.2d 621 (D.C.Cir.1980) (per curiam).

**32.** *Id.* at 653 (emphasis in original).

Since there is no way of knowing whether the jury relied solely upon Ignacio Novo's false declarations to the jury in convicting him on the misprision charge, as it could have, it is impossible for us to determine precisely whether appellant was unconstitutionally punished twice for the same offense. The evidence of the false declarations was admittedly sufficient to support the misprision charge and there is a tangible danger that the trial jury may have relied solely on such evidence in returning the guilty verdict on the misprision charge. Therefore, to avoid gambling with appellant's constitutional rights, if we had not vacated the misprision conviction for failure to sever, we would vacate the judgment imposing appellant's consecutive sentence on the charge of misprision.[33]

Under *Sampol* Harley would have a colorable claim. The two clearly distinct statutory provisions might have been proved by the same evidence.

Since *Sampol*, however, the Supreme Court has spoken again on the Double Jeopardy issue in *Albernaz v. United States*.[34] In *Albernaz* the defendants received consecutive sentences on related charges of conspiracy to import marijuana and conspiracy to distribute marijuana. The conspiracy underlying both convictions was the same; the only issue was whether two statutes distinguishable only by their goals constituted the "same offense."

The Court treated the issue as one of statutory construction:

[T]he question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed. Where Congress intended, as it did here, to impose multiple punishments, imposition of such sentences does not violate the Constitution.[35]

The Court observed further in a footnote:

It is well settled that a single transaction can give rise to distinct offenses under separate statutes without violating the Double Jeopardy Clause.[36]

*Albernaz* sheds new light on *Sampol,* and effectively overrules it. The lodestar must be the intent of Congress. The court's application of *Blockburger* must look to what Congress has said; the court's application of Congress' intent ought not to be led astray by the happenstance of what evidence comes before the court.

The Court's approach in *Albernaz* also makes solid common sense. In applying the *Blockburger* test to statutes, the court performs an objective and easily policed function; it simply compares the terms of the relevant statutory provisions. The congressionally established scheme of punishment is not subject to disruption by an overreaching court. The court, in keeping with its place in the balance of powers, merely applies such penalties as Congress has prescribed.

The *Sampol* approach, by contrast, requires the court to pursue a more treacherous and intrusive course of action. The *Sampol* approach artificially focuses the court's attention on that *portion* of the evidence that supports *both* convictions. First, the court must scrutinize only the *shared*

---

33. *Id.* at 655.

34. 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981).

35. *Id.* at 344, 101 S.Ct. at 1145.

36. *Id.* at 344–45 n. 3, 101 S.Ct. at 1145 n. 3. As the Court observed, several other Supreme Court cases had made similar assertions. *See, e.g., Harris v. United States,* 359 U.S. 19, 79 S.Ct. 560, 3 L.Ed.2d 597 (1959); *Gore v. United States,* 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d

1405 (1958). The *Blockburger* court had even indicated that the same transaction could lead to conviction under several different statutes. In doing so the *Blockburger* court relied on older authority.

'A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.' 284 U.S. at 304, 52 S.Ct. at 182, quoting *Morey v. Commonwealth,* 108 Mass. 433, 434 (1871).

evidence to see if it alone could have supported both convictions. The court must undertake this invasion of the jury's province even where no objection to the sufficiency of the evidence could be made where all the evidence was considered. Second, if it finds that the shared evidence alone could support both convictions, the court must take the paradoxical step of discarding one of the penalties—no matter how heinous and analytically dissimilar the crimes may be, no matter that in fact the jury's determination may not have rested on the shared evidence. The court must perform all these tasks without regard to the presumptive congressional intent to punish twice those who break the law twice.

Since *Albernaz,* the approach of Sampol is untenable. Applying the *Blockburger* test in light of *Albernaz,* we find it uncontroverted that the two statutory provisions each contain an element not in the other. The intent of Congress thus must have been to punish twice those who found a way to violate both statutes with a single course of action. We must reject Harley's double jeopardy claim.

### V.   Conclusion

For the foregoing reasons, the judgment of the district court is

*Affirmed.*