884 F.2d 1390
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Thornton Randolph MILLS, Defendant-Appellant.
 No. 88-5533.
 United States Court of Appeals, Fourth Circuit.
 Argued May 12, 1989.
Decided Aug. 16, 1989.
 
 Thomas C. Manning, Cheshire, Parker, Hughes & Manning, for appellant.
 Margaret Person Currin, United States Attorney, John Stuart Bruce, Assistant United States Attorney for appellee.
 Before WIDENER, Circuit Judge, HAYNSWORTH, Senior Circuit Judge, and THOMAS SELBY ELLIS, III, United States District Judge for the Eastern District of Virginia, sitting by designation.
 PER CURIAM:
 
 
 1
 Appellant Thornton Mills challenges his conviction on two counts of making false statements before a federal grand jury on two grounds. First, Mills contends that his statements before a federal grand jury were not material misstatements. Second, Mills asserts that the government's evidence was insufficient to support his conviction. Finding no error, we affirm.
 
 
 2
 * During the late evening of Friday, August 1, 1986, Douglas Sloan was murdered in Wrightsville Beach, North Carolina. Because there was no evidence of a forced entry, robbery or struggle, the police investigation focused on Sloan's estranged wife, Diane Sloan. The Sloans had separated and Douglas had sued for divorce. When the investigative trail led to Diane Sloan's new home in Charleston, South Carolina, the local authorities requested the assistance of the Federal Bureau of Investigation.
 
 
 3
 On October 2, 1986, investigators interviewed Diane Sloan and a number of her acquaintances in Charleston. Among those interviewed was Randy Mills, the owner of a local bar, whom the investigators suspected of being romantically involved with Sloan. According to the investigators, Mills stated that he was dating Sloan exclusively. Moreover, Mills admitted that Diane Sloan had told him of Douglas Sloan's death by telephone from her parents' house on Saturday, August 2. Telephone records revealed this call took place at 6:19 p.m. on that date. Significantly, Diane Sloan had been officially notified of Douglas Sloan's death at 7:00 p.m. on August 2. Mills' statement, therefore, indicated that both he and Diane Sloan had known of Douglas's death prior to Diane's receiving official notice from the police.
 
 
 4
 Also interviewed in Charleston was Herman Puckhaber, Mills' employee and roommate. Puckhaber confirmed that Mills was dating Diane Sloan. Puckhaber also stated that he learned from Mills of Douglas Sloan's murder either on the morning of Saturday, August 2, or Sunday, August 3, immediately after Mills had received another phone call from Diane Sloan.[1] Mills conceded he was not home on the morning of August 3. Thus, the investigators reasonably believed that the conversation between Puckhaber and Mills must have taken place on the morning of Saturday, August 2. Yet Douglas Sloan's body was not discovered until 2:30 p.m., Saturday afternoon. Puckhaber's statements, therefore, indicated that Mills and Diane Sloan knew of Douglas Sloan's death prior to the discovery of his body.
 
 
 5
 Upon completing their investigation, the local authorities requested the assistance of the United States Attorney's office. As a result, a federal grand jury (the "Grand Jury") began investigating Douglas Sloan's murder. Specifically, the Grand Jury investigated whether Douglas Sloan had been killed as a result of a murder-for-hire arranged by Diane Sloan and Mills.
 
 
 6
 On April 8, Mills appeared before the Grand Jury. At that time, Mills was advised of his right against self-incrimination, his right to consult with counsel and his status as a subject of the Grand Jury investigation. During Mills' testimony, he repeatedly denied being romantically involved with Diane Sloan until several months after Douglas's murder. Mills also testified that he had not sold his bar and remained its sole owner.
 
 
 7
 On April 21, 1987, at Mills' request, three investigators met Mills for a further interview. At that time, Mills stated that he had in fact sold fifty percent (50%) of his bar business to Diane Sloan on March 25, 1987, some two weeks prior to testifying before the Grand Jury. According to the agents, Mills explained the discrepancy in his testimony by stating that the sale had been handled by Diane Sloan and Mills' accountant without Mills' knowledge.
 
 
 8
 The Grand Jury subsequently returned an indictment charging Mills with six counts of making false statements before it. Count Two alleged that Mills' statements about his relationship with Diane Sloan were knowingly false. Count Three alleged that Mills' statements that he was sole owner of the bar were knowingly false.
 
 
 9
 At trial, a number of Mills' and Sloan's friends testified that a romantic relationship existed between Mills and Sloan prior to Douglas Sloan's death. Puckhaber testified that during the summer of 1986 Mills and Sloan "were seeing each other as boyfriend/girlfriend." This observation was based on Puckhaber's seeing them together at the bar and on dates. Puckhaber also testified that Mills told him during the summer that he had "gone to bed with [Sloan]." Puckhaber further testified that prior to August 1, 1986, Mills had discussed the fact that he was romantically involved with Sloan. Puckhaber had previously given a written statement relating Mills' admission to him of sexual relations with Sloan prior to August 1986. This statement was introduced as evidence at trial without objection.
 
 
 10
 Judy Causey, another employee of Mills, also testified at trial. Causey admitted that she had testified before the Grand Jury that Mills and Diane Sloan were "seeing each other" and "dating" during the summer of 1986. An excerpt of this Grand Jury testimony was admitted as substantive evidence at trial. In addition, Elayne Tomsic, a friend of Diane Sloan in Charleston, testified to socializing with Diane and Mills during the Summer of 1986. Moreover, Theodore ("Ted") Williams, a friend and business associate of Mills, testified that he noticed that Diane Sloan was dating Mills within a week or two of Douglas Sloan's death.
 
 
 11
 In addition to this testimony, the police officers who interviewed Mills in Charleston on October 2, 1986 both testified that Mills had admitted that he had been dating Sloan since April or May and that their relationship was a continuing one. Yet another police officer testified that while riding in an automobile with Mills and Ted Williams, he heard Mills make a statement to Williams indicating that Mills had an ongoing sexual relationship with Sloan.
 
 
 12
 The government also presented evidence that Mills knew of the sale of his bar prior to testifying before the Grand Jury. William J. Thrift, an accountant who had once worked for Mills, testified that Mills spoke with him in February 1987 about transferring the bar to Diane Sloan for a nominal price. Soon thereafter, Thrift ceased working for Mills. Mills' next accountant, Dennis Baars, testified that in the latter part of March 1987 he discussed with Mills and Sloan, a plan by Mills to sell a portion of his business to Sloan for five thousand dollars ($5,000). He prepared a Bill of Sale transferring fifty percent (50%) of the bar to Sloan. According to Baars, Mills signed this Bill of Sale in Baars' presence on March 25, 1987.
 
 
 13
 Also introduced at trial were copies of bank records reflecting that Mills knew of the sale of 50% ownership in his bar prior to his testifying before the Grand Jury. These records showed that on March 25, 1987 Sloan gave Mills a check for $5,000, which Mills endorsed and deposited in the bar's bank account on March 26, 1987.
 
 
 14
 In his trial testimony, Mills admitted making the statements before the Grand Jury. As to Count II, he claimed not to understand what the questioner in the Grand Jury meant by terms such as "boyfriend/girlfriend." Moreover, Mills denied any close association with Sloan prior to the Winter of 1986-87. As to Count III, Mills admitted that he had personally participated in the March 27 transfer. According to Mills, he answered the Grand Jury questions negatively because he believed certain legal formalities relating to the stock transfer had not been completed. Mills denied telling the agents on April 21 that he had not learned of the March 27 transfer until after his Grand Jury testimony.
 
 
 15
 The jury found Mills guilty of perjury as to Counts II and III. Mills was acquitted on all remaining counts. Mills filed a timely post-verdict motion for acquittal pursuant to Rule 29(c), Fed.R.Crim.P. The motion was denied. The trial court subsequently consolidated Counts II and III for entry of judgment and sentenced Mills to a three-year term of imprisonment. This appeal followed.
 
 II
 
 16
 Mills argues that his statements before the Grand Jury were not material to the Grand Jury's deliberations. Materiality is a question for the court. Sinclair v. United States, 279 U.S. 263 (1929); United States v. Bailey, 769 F.2d 203 (4th Cir.1985). It is well settled that a statement is material if it has "the natural effect or tendency to impede, influence, or dissuade the grand jury's investigation." United States v. Farnham, 791 F.2d 331, 333 (4th Cir.1986); United States v. Paolicelli, 505 F.2d 971, 973 (4th Cir.1974). Materiality in the grand jury context is construed broadly. Paolicelli, 505 F.2d at 973; United States v. Berardi, 629 F.2d 723, 727 (2d Cir.), cert. denied, 449 U.S. 995 (1980). So long as a false statement had the potential to impede the grand jury investigation, it is material. United States v. Friedhaber, 856 F.2d 640, 642 (4th Cir.1988) (en banc). The false statement need not actually influence the grand jury's investigation. Id.
 
 
 17
 Relying on Clayton v. United States, 284 F. 537 (4th Cir.1922), Mills argues that statements before a grand jury are material only if they are relevant to an appropriate focus of the grand jury investigation. Here, the Grand Jury was impaneled to investigate whether Douglas Sloan was slain as a result of a murder-for-hire, violating 18 U.S.C. Sec. 1952A. According to Mills, no evidence was adduced to support an indictment under Sec. 1952A. Given this, Mills argues that the Grand Jury's investigation itself was inappropriate and that even if his statements were false, they could not be materially false.
 
 
 18
 Mills misconstrues Clayton. There, the defendant was convicted of perjury for lying to a grand jury about whether he had been intoxicated within the past year. That grand jury was investigating violations of the Prohibition Act. Intoxication was not a violation of the Prohibition Act. Thus, the Clayton court properly found that "[t]he mere fact of defendant's intoxication ... had no relevancy to any issue or controversy pending before the grand jury ..." Id. at 541. Put differently, the Clayton defendant's false statements concerning intoxication could not "impede, influence, or dissuade the grand jury's investigation." United States v. Farnham, 791 F.2d 331, 333 (4th Cir.1986).
 
 
 19
 The instant case contrasts sharply with Clayton. Here, unlike Clayton, Mills' falsehoods were central to the federal criminal investigation, viz, murder-for-hire, that was appropriately the focus of the Grand Jury's investigation.[2] The questions Mills answered falsely were meant to elicit evidence of Mills' personal and professional relationship with Diane Sloan. Mills' romantic relationship with Sloan would shed light on a possible motive for his assisting her in murdering her husband. Mills' financial relationship with Sloan was also undeniably relevant to determine whether she might have paid Mills to have her husband murdered, a necessary prerequisite of a murder-for-hire. Since Mills' false statements might have misled the Grand Jury as to two necessary elements of their murder-for-hire investigation--motive and financial renumeration--they were undeniably material. See United States v. Friedhaber, 856 F.2d 640, 642 (4th Cir.1988) (en banc).
 
 
 20
 Also meritless is Mills' argument that his false statements were not material because the Grand Jury issued no indictment. This fallacious argument, if accepted, would eviscerate the purpose of the grand jury as an independent investigative body. The grand jury's purpose is to protect potential defendants from prosecution by the government without probable cause. If the grand jury concludes that there is not sufficient evidence of a federal crime, then no indictment issues. But this does not mean that the grand jury's investigation was improper. On the contrary, the grand jury's failure to indict demonstrates that it has properly exercised its independent judgment. As the Fifth Circuit eloquently put it in United States v. McInnis, 601 F.2d 1319, (5th Cir.), rehearing en banc denied, 608 F.2d 524 (1979),
 
 
 21
 because it is an investigatory agency, and because its primary function is to safeguard defendants from prosecution, without probable cause, not to aid the Government, the grand jury must necessarily be able to investigate activities that it might later decline to indict.... Unless the grand jury has such latitude, there is little reason for its existence, and it would be incapable of prosecuting citizens by exercising its independent judgment.
 
 
 22
 Id. at 1327 (citations omitted); see also United States v. Bridges, 717 F.2d 1444 (D.C.Cir.1983). In short, the materiality of false statements to a grand jury cannot depend on whether an indictment ultimately issues.[3]
 
 III
 
 23
 Mills also contends that the government's evidence was insufficient to convict him of perjury. This claim is meritless. As to both Counts II and III, the jury's verdict was supported by substantial evidence and must, therefore, be sustained. Glasser v. United States, 315 U.S. 680 (1942); United States v. Jones, 735 F.2d 785, 790 (4th Cir.), cert. denied, 469 U.S. 918 (1984).
 
 
 24
 As to Count II, Puckhaber, Causey, Tomsic and Williams all testified that Mills was sexually involved with Diane Sloan in August 1986. Two police officers testified that Mills had told them he had been dating Sloan since April or May 1986, and another officer testified that Mills made statements suggesting he was dating Diane Sloan at that time. This evidence directly contradicted Mills' testimony before the Grand Jury. Mills' only defense at trial was that he did not understand the terms used by the Grand Jury: "romantically and sexually involved," "boyfriend/girlfriend relationship," and "sleep together." The jury could reasonably conclude that this explanation was flatly false and disingenuous.
 
 
 25
 As to Count III, Mills' accountant testified that he saw Mills sign a Bill of Sale transferring 50% ownership in his bar to Sloan for $5,000 on March 25, 1987. Also in evidence was a cancelled check dated March 25, 1987 from Diane Sloan to Mills for $5,000. This check was endorsed by Mills on March 26, 1987. This evidence contradicted Mills' grand jury testimony. Moreover, Mills' statement to the police officers on April 21, 1987 that he did not know that a sale occurred in March 25, 1987 was in evidence. This statement contradicted Mills' trial testimony, impeached Mills' credibility and further supported the jury's conclusion that Mills committed perjury before the Grand Jury.
 
 
 26
 AFFIRMED.
 
 
 
 [1]
 There is apparently no telephone record of this call
 
 
 [2]
 Mills' allegations notwithstanding, there was ample evidence to warrant the Grand Jury's murder-for-hire investigation. The circumstances surrounding Douglas Sloan's death--the fact that the primary suspect was located in another state; the romance between Mills and Diane Sloan; the discovery that Mills and Diane Sloan may well have had knowledge of Douglas Sloan's death before Douglas' body was discovered--all justified a murder-for-hire investigation
 
 
 [3]
 As previously noted, see supra note 2, there was ample evidence to warrant the Grand Jury's murder-for-hire investigation and its summoning Mills to testify before it. See United States v. McInnis, 601 F.2d 1319, 1327 (5th Cir.), reh'g en banc denied, 608 F.2d 524 (1979)