Clifford EDWARDS, Appellant,

v.

UNITED STATES, Appellee.

No. 88–300.

District of Columbia Court of Appeals.

Argued April 24, 1990.
Decided Nov. 13, 1990.

G. Godwin Oyewole, Alexandria, Va., appointed by this court, for appellant.

Richard L. Edwards, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, Helen M. Bollwerk and Lynn Leibovitz, Asst. U.S. Attys., were on the brief, for appellee.

Before BELSON and SCHWELB, Associate Judges, and MACK, Senior Judge.

SCHWELB, Associate Judge:

This case arises out of a brutal assault by a husband on his wife, a beautiful woman who worked as a model and who was severely injured and permanently disfigured as a result of the events which led to the husband's prosecution. On appeal from his convictions for assault with a dangerous weapon (ADW), D.C.Code § 22–502 (1989), mayhem while armed, and malicious disfigurement while armed, *id.* §§ 22–506, –3202, the husband, appellant Clifford Edwards, contends that there was insufficient evidence to establish that he committed the crime while armed with one or more dangerous weapons. He also claims that his ADW conviction necessarily merges into his mayhem and malicious disfigurement convictions, and, belatedly,[1] that his convic-

---

1. This argument was made more specifically in Edwards' supplemental submission after this court, acting *sua sponte* following oral argu-ment, directed the parties to file additional memoranda.

tions of mayhem and malicious disfigurement also merge.

We hold that the evidence was insufficient to support the jury's finding that Edwards inflicted his wife's injuries while armed, within the meaning of Section 22-3202, when his alleged weapon consisted of one or more fixed or stationary plumbing fixtures against which he hurled his hapless wife.[2] We further conclude that under the circumstances of this case, Edwards' assault conviction merges into his conviction of malicious disfigurement. Finally, we hold that Edwards' convictions of mayhem and malicious disfigurement do not merge, because each offense contains an element which the other does not, and because the government proved mayhem which was not malicious disfigurement and malicious disfigurement which was not mayhem. Accordingly, there was no violation of the Double Jeopardy Clause. We therefore affirm in part, reverse in part, and remand for resentencing.

I

THE TRIAL COURT PROCEEDINGS

Edwards' prosecution arose out of injuries sustained by his wife on the night of January 5–6, 1987. The government's theory of the case was that Edwards assaulted his wife by repeatedly slamming her head against the bathtub, sink and toilet in the bathroom of their apartment.

Mrs. Edwards had no recollection of the specifics of the attack, but the government offered the testimony of two paramedics who responded to a call from the Edwards' apartment on the night of the assault. When they arrived at about 5:00 a.m. on the morning of January 6, they found Edwards sitting quietly on the living room couch. Mrs. Edwards was lying on the floor in a fetal position, bleeding and hysterical. There was a trail of blood on the floor leading from Mrs. Edwards' location to the bathroom. In the bathroom, the paramedics found blood on the sink, on the toilet, on the bathtub, on the floor and on the walls. Photographs of the apartment reflecting these conditions were taken later on the same day and eventually introduced into evidence.

Dr. Peter W. Connole, Mrs. Edwards' physician, testified extensively about her injuries. He related, among other things, that some time shortly before her admission to the hospital on January 6, 1987, Mrs. Edwards had suffered a severe brain contusion, along with lacerations on her face and head. Her left cheekbone was broken, as were the bones that surround her left eye. Mrs. Edwards had also lost portions of several of her teeth. In Dr. Connole's opinion, Mrs. Edwards' head had been struck by, or was pushed against, a hard object, and this was done with "a significant amount of force." He believed that it was highly probable, "somewhere above 80 percent," that her wounds were not self-inflicted. Mrs. Edwards testified that at the time of trial, more than a year after the incident, her left cheek remained "depressed" because she no longer had a left cheekbone, and that her left eye was no longer horizontally aligned. She stated that her vision was now impaired, so that she had to wear eyeglasses. She had not regained full motion in her jaw and was unable to eat fruit, hard candy or other thick foods because these activities caused her pain. Her mental processes were also affected, in that her comprehension had become impaired. Moreover, Mrs. Edwards now had a protrusion on her forehead which reached down between her eyebrows. She explained that these deformities had an effect on her modeling, and asked rhetorically, "How many people want to show pictures of a model, where it is supposed to represent fashion, that has a dented head?"

Edwards did not testify at trial. On the day of the assault, however, he told one of the officers who had responded to the scene to investigate the matter that "he had struck [his wife] with his hand, and whatever she said was true." He declined to elaborate. Several neighbors also testi-

---

**2.** The indictment charged that Edwards "was armed with a dangerous weapon, that is, an unknown object" when he committed the alleged offenses.

fied, and one of them related that she had heard "furniture and things being knocked over," a man cursing, and a woman screaming.

Edwards contended throughout the trial that there was insufficient evidence that the offenses had been committed with the bathroom fixtures as alleged, and that in any event such stationary objects were not dangerous weapons with which Edwards could be armed. Although the trial judge was plainly troubled by these issues, he concluded, following extensive argument, that the jury could reasonably find that Mrs. Edwards' injuries were inflicted in the manner which the government claimed they were. The judge also ruled that if Edwards took his wife's head and repeatedly smashed it into the sink or toilet bowl, then these objects were dangerous weapons within the meaning of the statute. The judge stated, however, that "I think it is a close call on that one."

The jury acquitted Edwards of assault with intent to kill while armed but convicted him of assault with a dangerous weapon, malicious disfigurement while armed and mayhem while armed. This appeal followed.

## II

### ENHANCEMENT ISSUES

A. The Statute.

D.C.Code § 22–3202 (1989) provides in pertinent part as follows:

(a) Any person who commits a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm (or imitation thereof) or other dangerous or deadly weapon (including a sawed-off shotgun, shotgun, machinegun, rifle, dirk, bowie knife, butcher knife, switchblade knife, razor, blackjack, billy, or metallic or other false knuckles):

(1) May, if he is convicted for the first time of having so committed a crime of violence in the District of Columbia, be sentenced, in addition to the penalty provided for such crime, to a period of im-

prisonment which may be up to life imprisonment. . . .

Edwards maintains that even if the incident occurred as the government claims it did, he nevertheless was not "armed" with a "dangerous weapon" as those terms are used in Section 22–3202. Resorting to the dictionary, he contends that a weapon is "an instrument of offensive or defensive combat: something to fight with." M. WEBSTER, THIRD NEW INTERNATIONAL DICTIONARY 2589 (1971). He says that a stationary sink, commode or bathtub cannot be a weapon within that definition or within the statute. Although, as the trial judge recognized, the issue is not an easy one, we agree with Edwards.

We are dealing here with the construction of a criminal statute imposing enhanced punishment up to and including imprisonment for life. This alone must give us pause before we give the word "weapon" an expansive interpretation. A defendant may not be subjected to a criminal penalty unless the words of the statute plainly impose it. *United States v. Campos–Serrano*, 404 U.S. 293, 297, 92 S.Ct. 471, 474, 30 L.Ed.2d 457 (1971). "Statutes creating crimes are to be strictly construed in favor of the accused; they may not be held to extend to cases not covered by the words used." *United States v. Resnick*, 299 U.S. 207, 209, 57 S.Ct. 126, 127, 81 L.Ed. 127 (1936) (citations omitted). As Chief Justice Fuller stated for a unanimous Supreme Court a century ago, "[t]here can be no constructive offenses, and before a man can be punished, his case must be plainly and unmistakably within the statute." *United States v. Lacher*, 134 U.S. 624, 628, 10 S.Ct. 625, 626, 33 L.Ed. 1080 (1890); *accord, Resnick, supra*, 299 U.S. at 210, 57 S.Ct. at 210; *Zaimi v. United States*, 155 U.S.App.D.C. 66, 79–80, 476 F.2d 511, 524–25 (1973). The question before us, therefore, is whether the bathroom fixtures were "plainly and unmistakably" dangerous weapons with which Edwards could be "armed," or which he could have "readily available," within the meaning of Section 22–3202.

"A word is known by the company it keeps." *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961). The specific dangerous instrumentalities enumerated in Section 22–3202 are all items which an assailant carries and then uses to shoot, stab, or otherwise wound his adversary. They do not include stationary objects or anything resembling them. This may implicate the maxim known as *"ejusdem generis"*, which has been well articulated as follows: "Where general words follow[3] specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." 2A N. Singer, Sutherland Statutory Construction § 47.17, at 166 (4th ed. 1984); *see also United States v. Brown*, 309 A.2d 256, 258 (D.C.1973).[4] This aid to construction is justified on the ground that if the legislature had intended the general words to be used in their unrestricted sense, it would not have included the particular words. 2A Sutherland, *supra*, § 47.17, at 166; *In re Bush Terminal Co.*, 93 F.2d 659, 660 (2d Cir.1938). It has been stated that this doctrine is especially applicable to penal statutes. 2A Sutherland, *supra*, § 47.17, at 166, and authorities cited at 176 n. 10. Latin maxims will only take us so far, however; "[t]he crux of the matter is that the rule of *ejusdem generis* is only a constructionary crutch and not a judicial ukase in the ascertainment of legislative intention." *State v. Small*, 99 N.H. 349, 351, 111 A.2d 201, 202 (1955); *see also Standard Oil Co. v. Anderson*, 212 U.S. 215, 220, 29 S.Ct. 252, 253, 53 L.Ed. 480 (1909).

Another guide to the meaning of "weapon" in Section 22–3202 is its use in related legislation. D.C.Code § 22–3214(b) (1989) provides that "[n]o person shall within the District of Columbia *possess*, with intent to use unlawfully against another, an imitation pistol, or a dagger, dirk, razor, stiletto, or knife with a blade longer than 3 inches, *or other dangerous weapon.*" (Emphasis

added). There is a presumption that the same words used twice in the same legislation have the same meaning. 2A Sutherland, *supra*, § 46.06, at 104; *ICC Indus., Inc. v. United States*, 812 F.2d 694, 700 (Fed.Cir.1987). "When the meaning of a word in a statute is doubtful, it is appropriate to refer to related legislation to determine the sense in which the word was employed in the particular statute." *Coldwell Banker–First Realty, Inc. v. Meide & Son, Inc.*, 422 N.W.2d 375, 380 (N.D.1988). It is difficult to conceive how an attached bathroom fixture could be "possessed" with the intent to use it as a weapon, and this would suggest that such a stationary object does not fall within the ambit of Section 22–3202. The presumption that identical words used in the same or related legislation were intended to have the same meaning is not a rigid one, however, *see Atlantic Cleaners and Dyers, Inc. v. United States*, 286 U.S. 427, 433, 52 S.Ct. 607, 609, 76 L.Ed. 1204 (1932), and we cannot say that the notion that a weapon is something which the defendant must be able to "possess" is necessarily dispositive. Canons of construction provide some guidance, but cannot anticipate all of the variables which converge in a concrete case.

### B. District of Columbia Precedent.

This court has employed a functional rather than a maxim-shackled analysis in determining whether a particular object is a "dangerous weapon." In holding that a Cadillac automobile, which bears little or no resemblance to the enumerated instrumentalities, may nevertheless be encompassed by the enhancement provisions of Section 22–3202, this court stated that "an instrument capable of producing death or serious bodily injury by its manner of use qualifies as a dangerous weapon whether it is used to effect an attack or is handled with reckless disregard for the safety of others." *Powell v. United States*, 485 A.2d 596, 601 (D.C.1984) (per curiam), *cert. denied*, 474 U.S. 981, 106 S.Ct. 420, 88 L.Ed.2d 339

---

**3.** Or precede.

**4.** "The doctrine, often called Lord Tenterden's Rule, is of ancient vintage, going back to Arch-

bishop of Canterbury's Case, 2 Co.Rep. 46a, 76 Eng.Repr. 519 (1596)." 2A Sutherland, *supra*, § 47.17, at 166.

(1985). Similarly, in *United States v. Gualdado*, 794 F.2d 1533, 1535 (11th Cir. 1986), *cert. denied*, 479 U.S. 1101, 107 S.Ct. 1327, 94 L.Ed.2d 178 (1987), the court upheld appellants' conviction of assault with a dangerous weapon where they had rammed customs officials with their boat. Quoting *United States v. Barber*, 297 F.Supp. 917 (D.Del.1969), the court explained that

> [a]lmost any object which as used or attempted to be used may endanger life or inflict great bodily harm, or which is likely to produce death or great bodily injury, can in some circumstances be a dangerous weapon.

*Id.*

"The best evidence of [a weapon's] dangerous character, and of what it was capable of doing, was the injury actually inflicted by it." *Hopkins v. United States*, 4 App.D.C. 430, 442 (1894);[5] *see also Freeman v. United States*, 391 A.2d 239, 242 (D.C.1978). Accordingly, a dangerous weapon need not be a hand-held item, like a pistol, dagger or hatchet, which could readily be used in combat. *Tatum v. United States*, 71 App.D.C. 393, 393–94, 110 F.2d 555, 555–56 (1940) (lye); *Logan v. United States*, 460 A.2d 34, 36 (D.C.1983) (fire).

The parties have cited no District of Columbia authority, and we have found none, addressing the precise question whether a stationary fixture may be a dangerous weapon. The government relies primarily on *Logan, supra*, while Edwards invites our attention to *Curtis v. United States*, 568 A.2d 1074 (D.C.1990). Neither decision is controlling.

In *Logan*, the defendant first tried to push the complainant's face into a gas burner on a kitchen stove. He then set some telephone books on fire in the living room and tried to thrust the complainant into the resulting conflagration. Sustaining Logan's ADW conviction in connection with the burning telephone books, this court stated that

[a]ppellant attempted to shove Osborne into these flames. A jury could reasonably find that appellant, through conduct separate and distinct from his actions in the kitchen, intended in the living room to harm Osborne with a dangerous weapon—namely, fire.

460 A.2d at 36. *Logan* differs from the present case, however, in that there the appellant lit the fire for the purpose of using it as a weapon and propelled his victim into it. The telephone books which Logan ignited were movable items which he possessed for use against another. In the present case, the bathroom fixtures were but a pre-existing part of the surroundings in which Edwards found himself while perpetrating the assault. They were not something which Edwards could possess or with which he could arm himself as he went looking for his victim.

In *Curtis*, this court considered the question whether convictions of malicious disfigurement while armed and assault with a dangerous weapon merged with one another. 568 A.2d at 1076. In analyzing the elements of the two offenses, we observed that "[e]ven an armed man could inflict disfigurement without the use of any weapon, *e.g.*, by breaking the victim's nose with a punch or kick, pushing his face against barbed wire or a hot stove." *Id.* The court's focus in this discussion was on the weapon with which the hypothetical defendant was armed, and the lack of any connection between that weapon and the victim's injury. The court was not asked to, and did not, decide whether a stationary object can be a dangerous weapon when used by an otherwise unarmed defendant in order to inflict injury. Although the court's use of the word "any" suggests that a defendant who injures a person by pushing him into barbed wire or a hot stove has not "used" any weapon, the court was not confronted with the question here

---

**5.** The weapon in *Hopkins* was a brickbat, or a quarter of a brick. Brickbats appear to have been weapons of choice in years gone by. *See Swisher v. United States*, 572 A.2d 85, 95–96 & n. 1 (D.C.1990) (per curiam) (concurring opinion).

In *Hopkins*, the court went on to remark that "[a] brickbat in the hands of a strong man, bent upon mischief, is certainly a formidable missile, and perilous to life if used in a malicious and dangerous way ..." 4 App.D.C. at 442.

presented and did not address our opinion in *Logan*.[6]

## C. Other Precedents.

Several decisions in other jurisdictions cast some light on the question before us. In *State v. Johnson*, 770 S.W.2d 263 (Mo. App.1989), the defendant inflicted injuries on his inamorata when he grabbed her by the hair and beat her head against a door casing and later against some plumbing fixtures. *Id.* at 269. He also kicked and bit her. *Id.* Johnson was convicted of first degree assault, (an offense of which the infliction of serious injuries is an element). He was eventually sentenced to life imprisonment as a recidivist. He appealed, in part, on the ground that the trial court committed plain error in not instructing the jury on the lesser included offense of second degree assault with a dangerous instrument. The court summarily rejected his contention, stating that

> [i]t was, under the facts here, untenable to suggest that the dangerous instrument or deadly weapon components of the statute were implicated.

*Id.*[7] There was no additional analysis.

In *State v. Legendre*, 362 So.2d 570 (La. 1978), the defendant was charged with aggravated battery with a dangerous weapon. Responding to a motion for a bill of particulars, the prosecutor identified the weapon as "Concrete on Parking Lot." The somewhat unusually phrased Louisiana statute under which Legendre was prosecuted defined "dangerous weapon" as including "any gas, liquid or other substance or instrumentality which, in the manner used, is calculated or likely to produce death or great bodily harm." [8] *Id.* at 571 (citing La.Rev.Stat. § 14:2(3)). The Supreme Court of Louisiana held that Legendre could not be prosecuted for aggravated battery because

> [a] dangerous weapon is not by that definition or any other an expanse of concrete forming a parking lot; just as it is not a graveled area or the turf in a meadow. We realize that the accused could use the concrete of the parking lot by striking the victim a blow which would cause him to fall upon the concrete and sustain injuries.[9] But this is not 'use' of a 'weapon.' No other 'use' of the concrete parking lot has been suggested which would produce death or great bodily harm.
>
> Obviously by relying upon a concrete parking lot as a dangerous weapon, the State is seeking to convert this offense into aggravated battery. Without a dangerous weapon involved the offense would necessarily be one of a lesser grade. In doing so the State is attempting to extend the article of the Code so as to create a crime not provided for therein, contrary to the spirit and letter of the law. This is not genuine construction of the term dangerous weapon as contemplated by the statute defining aggravated battery. According to the fair

**6.** Edwards also relies on this court's statement in *Paris v. United States*, 515 A.2d 199, 204 (D.C.1986) that

> any object which *the victim perceives* to have the apparent ability to produce great bodily harm can be considered a dangerous weapon.

(Emphasis added). Nothing in *Paris* was intended to suggest, however, that an object cannot be a dangerous weapon if the victim has not perceived it; a defendant is surely armed with a dangerous weapon if he ambushes his victim and shoots him from behind with a bazooka or severs his cervical vertebrae with a scimitar.

**7.** Johnson apparently argued that his teeth and fists, rather than the door casing and plumbing fixtures, constituted the dangerous weapon. The case is therefore not a square holding on the question before us. A fair reading of the opinion suggests, however, that the court would

have regarded as quite beyond the pale the notion that any dangerous weapon had been employed or that the stationary plumbing fixtures brought the case within the "dangerous instrument" provisions.

**8.** This statute illustrates the limits of the doctrine of *ejusdem generis*. Obviously, a weapon need not be like gas or liquid in order to be dangerous.

**9.** Oddly, the court did not expressly address the more difficult question whether banging the victim's head against the concrete surface could constitute assault with a dangerous weapon. The quoted passage as a whole, however, is broad enough to preclude the notion that the parking lot could be a weapon under any circumstances.

import of the words in their usual sense dangerous weapon does not mean a concrete parking lot. La.Rev.Stat. 14:3. Consequently, the State has not charged a crime in the manner required by law.

*Id.* at 571–72. One justice dissented, expressing the view that

> [t]he majority's definition is contrary to the legislative intention to define a dangerous weapon in terms of how the instrumentality was actually used and not according to preconceived notions based on customary usages.

*Id.* at 572.

In the very recent case of *State v. Reed*, 101 Or.App. 277, 790 P.2d 551 (1990), the court took a strikingly different approach from that of the majority opinion in *Legendre*. The indictment charged that Reed knowingly caused injury to his girlfriend "by means of a dangerous weapon, to wit: concrete, by banging her head repeatedly against the concrete." *Id.* at 279, 790 P.2d at 551. Reed conceded that if he had forcibly brought a piece of hand-held concrete into contact with his victim's head, he could be found to have used a dangerous weapon. He contended, however, that the converse act of forcibly bringing her head into contact with the concrete was not the use of a dangerous weapon. The court disagreed:

> The statute provides that "any instrument, article or substance," no matter how harmless it may appear when used for its customary purposes, becomes a dangerous weapon when used in a manner that renders it capable of causing serious physical injury. [Citation and

footnote omitted]. As the state points out, "[w]hether the pitcher hits the stone or the stone hits the pitcher, it will be bad for the pitcher." Cervantes, *Don Quixote*, Part II, ch 43 (1615). Denial of the motion for judgment of acquittal was not error.

*Id.* at 279–80, 790 P.2d at 551–52. The court cited neither *Johnson* nor *Legendre.*[10]

### D. Conclusion.

■ In the final analysis, there being no binding authority in the District, we must decide whether to follow the reasoning in *Reed* or to adopt the more restrictive approach suggested by *Johnson* and by the majority opinion in *Legendre*. There is undoubtedly a certain logic to the result in *Reed*. Morally, running a victim into a spike is as culpable as stabbing him with a dagger. If Edwards had detached the commode from the floor and bludgeoned his wife with it, there would be no question that he would have been armed with a dangerous weapon within the meaning of Section 22–3202. The same damage could be done where the commode was still but the victim's head was in motion.

We share with our Oregon colleagues the most profound admiration for the distinguished creator of the immortal Don Quixote de la Mancha. We are constrained to note, however, that Cervantes' observations about the stone and the pitcher, while accurate and consistent with common sense, were not designed as a guide to the proper construction of a criminal statute. The question before us is not whether Mrs.

---

10. Several other cases merit consideration but are not dispositive. Attacks on an adversary with fire or with a burning object have been held to constitute assaults with a dangerous weapon. *See Logan, supra; Rice v. State*, 771 S.W.2d 599, 601 (Tex.Ct.App.1989); *State v. Riddick*, 315 N.C. 749, 759, 340 S.E.2d 55, 61 (1986). The same result has been reached where the defendant used a telephone receiver. *State v. Hatwan*, 208 Neb. 450, 453, 303 N.W.2d 779, 782 (1981); *Thomas v. State*, 524 P.2d 664, 665 (Alaska 1974) (per curiam). We find these authorities distinguishable, however, because in each case the defendant took possession of an object which was set on fire, or of a telephone receiver, and applied the improvised weapon to his victim in a conventionally assaultive way.

In *State v. Jacobs*, 34 Or.App. 755, 757, 579 P.2d 881, 882 (1978) *cert. denied*, 441 U.S. 926, 99 S.Ct. 2039, 60 L.Ed.2d 400 (1979), the defendant was found to have assaulted two small children with a dangerous weapon when he placed their buttocks in boiling hot water. We distinguish *Jacobs* upon the ground that the heated water in that case, like the fire in *Logan*, was not a permanent stationary fixture. *Jacobs* could take it into his possession, prepare it for use as a weapon, and then use it wherever he chose to inflict injuries on his victims. This could not be done with the bathroom fixtures in the present case.

Edwards could be injured as seriously by having her head slammed against a stationary toilet bowl as she could if she were bludgeoned with a detached one; she obviously could. We have no doubt that the legislature has the authority to punish the conduct revealed in this record as severely as an assault with any hard object, should it elect to do so. What we must decide, however, is not whether the legislature could or ought to treat the two situations interchangeably, but whether it has done so. Given the applicable principles of statutory construction described at pages 663–664, *supra*, we conclude that it has not. Accordingly, we hold that the government failed as a matter of law to prove that Edwards committed his crimes with a dangerous weapon. The convictions of malicious disfigurement while armed and mayhem while armed must therefore be reduced to malicious disfigurement and mayhem.

### III

### MERGER ISSUES

■ The Double Jeopardy Clause of the Fifth Amendment bars multiple punishments for a single offense. *Wilson v. United States*, 528 A.2d 876, 879 (D.C. 1987). Where a single act violates more than one criminal statute, however, a defendant may be convicted of each offense at a single trial, and may be sentenced for both (provided that the legislature intended that result) without transgressing the constitutional proscription. *Albernaz v. United States*, 450 U.S. 333, 337–40, 101 S.Ct. 1137, 1141–43, 67 L.Ed.2d 275 (1981). If each statutory offense requires proof of a fact that the other does not, the legislature is presumed to have authorized multiple punishments unless there is clear evidence of a contrary legislative intent. *Id.; see also* the seminal case of *Blockburger v.*

*United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).

We have previously had occasion to address double jeopardy issues in determining whether there was a merger between convictions for malicious disfigurement while armed and for ADW. In *Curtis, supra,* the weapon supporting the "while armed" element of the malicious disfigurement charge was also the weapon used in the assault. Noting that under recent holdings of this court, *e.g., Arnold v. United States*, 467 A.2d 136, 139 (D.C.1983) (per curiam), we may not simply consider elements of different crimes in the abstract, but must rather focus on the evidentiary context in the particular case, we held that the evidence which proved the offense of ADW "was a component of the proof of the greater offense of disfigurement," and therefore merged into it. *Curtis, supra,* 568 A.2d at 1076. Just as ADW merges into malicious disfigurement while armed, so simple assault—which is all that remains of the ADW conviction in light of the discussion in Part II, *supra*—merges into malicious disfigurement. The government correctly concedes that *Curtis* is controlling,[11] and the assault conviction must therefore be vacated.

■ We conclude, however, that Edwards' convictions for malicious disfigurement and mayhem do not merge. The elements of mayhem are: (1) that the defendant caused permanent disabling injury to another; (2) that he had the general intent to do the injurious act; and (3) that he did so willfully and maliciously. *Wynn v. United States*, 538 A.2d 1139, 1145 (D.C. 1988).[12] The elements of malicious disfigurement are: (1) that the defendant inflicted an injury on another; (2) that the victim was permanently disfigured; (3) that the defendant specifically intended to disfigure the victim; and (4) that the defendant was acting with malice. *Perkins v. United*

---

**11.** This concession was made with respect to the merger of assault with a dangerous weapon into malicious disfigurement while armed. Presumably, it remains in effect now that "dangerous weapon" has been removed from the lesser offense and "while armed" has been eliminated from the greater.

**12.** Although our opinion in *Wynn* does not use the phrase "disabling injury," we alluded to disablement as the essence of mayhem in *Smith v. United States*, 466 A.2d 429, 431 (D.C.1983) (per curiam).

*States,* 446 A.2d 19, 26 (D.C.1982) (per curiam).

Obviously, malicious disfigurement contains elements which mayhem does not; the government must prove that the defendant permanently disfigured his victim and specifically intended to do so. Whether mayhem contains an element which malicious disfigurement does not turns on whether its first element—that the defendant caused permanent disabling injury to another—is necessarily satisfied by proof of the second element of malicious disfigurement—that the victim was permanently disfigured. The question is whether a permanent "disfigurement" is by its very nature also a permanent disabling "injury."

*Perkins* holds that permanent disfigurement occurs when the victim is made "appreciably less attractive or . . . a part of his body is to some appreciable degree less useful or functional than it was before the injury." *Id.* One year after *Perkins,* this court held that the offense of "mayhem" is concerned with the "preservation of the normal functioning of the human body," while malicious disfigurement "focuses upon willful permanent disfigurement rather than disablement." *Smith, supra,* 466 A.2d at 431.

We recognized in *Perkins* that a single harm, *e.g.,* cutting off a person's nose, may constitute both a permanent "injury" and a permanent "disfigurement." *Smith,* although distinguishing between the two terms, does not hold otherwise. Espousing what is known as the "elements" approach, the government contends that as long as there can be a permanent disfigurement which is not a disabling permanent injury for purposes of the statute, e.g., a facial scar, multiple convictions do not violate *Blockburger.* It is irrelevant, according to the government, that the actual harm involved in a particular prosecution is in fact one that satisfies both definitions.

We have held on several occasions that proper multiple-punishment *Blockburger* analysis requires an examination of the evidence offered at trial, rather than the bare elements of the offenses. *Curtis, supra,* 568 A.2d at 1076; *Kingsbury v. Unit-* *ed States,* 537 A.2d 208, 210–11 (D.C.1988); *Worthy v. United States,* 509 A.2d 1157, 1158–59 (D.C.1986); *Arnold, supra,* 467 A.2d at 139. The government points to what it views as substantial case support for the "elements approach." *See Schmuck v. United States,* 489 U.S. 705, 716–22, 109 S.Ct. 1443, 1450–53, 103 L.Ed.2d 734 (1989); *Albernaz, supra,* 450 U.S. at 338, 101 S.Ct. at 1142; *United States v. Bridges,* 230 U.S.App.D.C. 387, 392–93, 717 F.2d 1444, 1449–50 (1983), *cert. denied,* 465 U.S. 1036, 104 S.Ct. 1310, 79 L.Ed.2d 708 (1984); *Waller v. United States,* 531 A.2d 994, 997 (D.C.1987); *Wilson, supra,* 528 A.2d at 880; and *Perkins, supra,* 446 A.2d at 26–27.

In the present case, however, we are not obliged to determine whether these various authorities are reconcilable with one another. At trial, the government offered evidence that Mrs. Edwards had suffered permanent disabilities, *i.e.,* impaired mental capacity and eyesight and restricted movement in her jaw, which do not involve permanent disfigurement. She also suffered disfigurement, *e.g.,* a "dented head," and other injuries to her appearance, which were not necessarily disabling injuries. Thus, the government proved mayhem which was not malicious disfigurement and malicious disfigurement which was not mayhem. Whether we look only to the elements of the offenses, as in *Albernaz,* or to the proof offered at trial, as in *Curtis,* the *Blockburger* test has been satisfied. We know of no overriding evidence that the legislature intended that a defendant may be prosecuted either for mayhem or for malicious disfigurement, but not for both. Accordingly, the dual convictions were constitutional.

### IV

### CONCLUSION

We vacate in part Edwards' convictions of malicious disfigurement while armed and of mayhem while armed. We affirm his convictions of the lesser included offenses of malicious disfigurement and of mayhem. We vacate the conviction of as-

sault with a dangerous weapon. The case is remanded to the trial court with directions to resentence Edwards for malicious disfigurement and for mayhem.

*So ordered.*